PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LORI RHOADS,
　　　　　　　*Plaintiff-Appellant,*

　　　　　v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as
receiver for Standard Federal
Savings Bank and Standard Federal
Savings Association,
　　　　　　　*Defendant-Appellee.*

GEORGETOWN APPELLATE LITIGATION
CLINIC,
　　　　　　　*Amicus Curiae.*

No. 98-2374

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Walter E. Black Jr., Senior District Judge.
(CA-94-1548-B)

Argued: October 30, 2000

Decided: July 12, 2001

Before WILKINS and KING, Circuit Judges, and
Frank J. MAGILL, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Wilkins and Senior Judge Magill joined.

---

**COUNSEL**

**ARGUED:** Adam Nathan Steinman, Supervising Attorney, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Amicus Curiae. Robert Parker Fletcher, NIXON PEABODY, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Lori Denise Rhoads, Appellant Pro Se. Leslie Paul Machado, NIXON PEABODY, L.L.P., Washington, D.C.; Kathryn R. Norcross, J. Scott Watson, FEDERAL DEPOSIT INSURANCE CORPORATION, Washington, D.C., for Appellee. Steven H. Goldblatt, Director, Richard D. Watkins, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Amicus Curiae.

---

**OPINION**

KING, Circuit Judge:

Lori Denise Rhoads appeals from the judgment rendered against her on her claims under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("FMLA"); the employment provisions of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12117, 12203 ("ADA"); and Maryland state law. The district court granted summary judgment to the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as representative of Rhoads's former employers, on her ADA claims — for failure to make reasonable accommodations, discriminatory termination, and retaliation — as well as the state law claims. *See Rhoads v. FDIC*, 956 F. Supp. 1239 (D. Md. 1997). A jury subsequently found in the FDIC's favor on the FMLA claim, *see* Order of Judgment, No. B-94-1548 (D. Md. Mar. 4, 1998), and the court denied Rhoads's motion for judgment as a matter of law or, alternatively, for a new trial, *see* Order, No. B-94-1548 (D. Md. Aug. 12, 1998). As explained below, we affirm the district court in every respect except for its award of summary judgment on the ADA retaliation claim, which we vacate and remand for further proceedings.

## I.

### A.

Rhoads was hired as a financial analyst in September 1987 by Standard Federal Savings Bank ("SFSB"). When the bank failed in October 1992, the Resolution Trust Corporation ("RTC")[1] was appointed as its receiver, and a new federal mutual savings association, Standard Federal Savings Association ("SFSA"), was chartered with the RTC as its conservator. Although Rhoads's employment with SFSB was terminated at its receivership, she was hired simultaneously for the same position with SFSA.

Rhoads suffers from asthma and related migraine headaches — conditions exacerbated by exposure to cigarette smoke. After starting work at SFSB, in the bank's Gaithersburg, Maryland office, Rhoads began feeling the negative effects from breathing co-workers' secondhand smoke. Due to SFSB's inability to control smoking on the premises, even after the introduction of a countywide smoking ban in 1990, Rhoads periodically sought medical attention for recurring bouts of bronchitis, pneumonia, severe lung infections, and cluster-migraine syndrome. The amount of secondhand smoke in the offices increased with the arrival of new RTC employees and managers when the bank became SFSA. Internal memoranda documented the detrimental effects of this smoke on Rhoads's health. *See, e.g.*, April 27, 1993 Memorandum from Michael O'Hopp, III, J.A. 49 ("The smoking is having a devastating health effect on one of my employees. . . . Please stop smoking immediately. If not because it is illegal, then out of professional courtesy and human kindness."). Because of her condition, SFSA officials allowed Rhoads to take lengthy absences from work. Eventually, in May 1993, O'Hopp, who was then Rhoads's supervisor, arranged for her to work at home to avoid exposure to secondhand smoke.

---

[1]The RTC was a federal government instrumentality created by Congress in 1989 to resolve the assets of failed savings and loan institutions. The FDIC is the statutory successor to the RTC, following its sunset on December 31, 1995. *See* 12 U.S.C. § 1441a(m).

During the time period that she worked at home, Rhoads's department was transferred to SFSA's Frederick Operations Center in Frederick, Maryland ("Frederick Center"). In June 1993, SFSA adopted a smoke-free workplace rule, to take effect on September 1 of that year, at which time smoking would be banned throughout the Frederick Center. That July, RTC officials discovered that Rhoads was being allowed to work at home and, subsequently, asked her to report to the Frederick Center for work. During meetings there on August 12 and 18, and in telephone conversations and letters, bank officials and Rhoads debated whether she would work at the Frederick Center, continue to work at home, or submit the necessary medical certification for disability leave. Ultimately, W. Marshall Jones, SFSA's Senior Vice President for Human Resources, informed Rhoads in an August 25 letter that she should report to work at the Frederick Center on September 1, to coincide with the date the building was to become smoke-free. Jones also said the bank would provide an air purifier for Rhoads's office.

Rhoads maintains, however, that she suffered a significant relapse of asthma and migraine headache symptoms because of her exposure to cigarette smoke at the Frederick Center during the two August meetings there. She saw four doctors during the period of August 12-31 and sought treatment in a hospital emergency room on August 21. Rhoads was given a variety of medications at varying dosages, and the treatments for asthma apparently compounded her migraine headaches. According to Rhoads, on August 31, one of her physicians, Alan S. Chanales, M.D., instructed her not to report to work the following day or for the rest of the week.

Thus, instead of reporting to the Frederick Center on September 1, Rhoads called James Pavlonnis, her immediate supervisor at the time, to relay her doctor's advice and postpone her expected return to work until the following week. On September 7, Rhoads informed Pavlonnis that she remained ill, her physician instructed her not to report to work that week, and she was using sick leave. Pavlonnis, SFSA's Executive Vice President and Chief Financial Officer, telephoned Rhoads on September 9 and insisted that she provide a doctor's note immediately. At Rhoads's request, Dr. Chanales faxed Pavlonnis a letter that same day. This note, dated September 2, had been composed in response to SFSA's earlier suggestion that Rhoads submit

medical documentation supporting a need for disability leave; without mentioning Rhoads's current condition, it indicated that she must work in a smoke-free environment or be allowed such leave. Pavlonnis consequently called Rhoads on September 10 and asked her if she was requesting disability leave. Rhoads — who had not seen Dr. Chanales's letter — replied that she did not know and did not feel that she had to decide because she was using accrued sick leave.

That same day, in a letter from Jones, Rhoads was threatened with disciplinary action if she did not report to work by September 13.[2] When Rhoads did not do so, she received a "final warning" letter from Jones, advising her that she had been placed on probation due to her "refusal to report to work the past eight business days[,]" and that her employment would be terminated if she failed to report on September 14. J.A. 269. The plan to terminate Rhoads under these circumstances was approved by a committee of SFSA officials.

Following receipt of the September 13 letter, Rhoads informed Jones by phone and by fax that she remained too ill to work and that her doctor would be sending SFSA further documentation of her condition within a few days. Indeed, on September 13, Dr. Chanales composed a letter stating:

> [Rhoads] continues to require treatment for her asthmatic disease which has been exacerbated by exposure to smoke on your premises. This treatment has been complicated by the development of severe headaches as a side effect of some of the medications that are being used to treat her asthma. She still is not in good enough shape to return to work, and I certainly continue to maintain that she should not be allowed in your work place unless it is certifiably free of cigarette smoke.

J.A. 273. Dr. Chanales did not, however, fax the letter to SFSA until September 16 — one day after senior officials in the RTC's Atlanta office authorized Rhoads's termination. A termination letter from

---

[2]An attorney for Rhoads responded with a letter requesting that she be granted disability leave. The letter also warned that SFSA might be violating the ADA, FMLA, and local laws. *See infra* Part IV.B.1.

Jones was hand-delivered to Rhoads during the evening of September 15, informing her that she had been fired for refusing to return to work for ten consecutive days "[w]ithout supervisory approval and in direct defiance of my repeated instructions." J.A. 349. The letter explained:

> In light of the accommodations we have made for any health condition you may have, your continued refusal to report to work cannot be tolerated.
>
> Contrary to the assertions in your letter of September 13, 1993, the notes from your physicians do *not* state that you are sick and cannot or should not be working. The notes state unequivocally that you can work if provided a smoke-free environment. As such, we have done everything your physicians have requested and more. We allowed you to work at home while smoking was still permitted at the Frederick Operations Center. On September 1, 1993, however, the Frederick Operations Center became a no-smoking building. We even provided a further accommodation for you beyond that your physicians requested, placing an air purifier in your work area. Nevertheless, you have continued to refuse to report to work.

*Id.* The FDIC, on the one hand, maintains that the termination was justified by Rhoads's excessive unexcused absenteeism. Rhoads, on the other hand, contends that SFSA should have at least waited for Dr. Chanales's letter to arrive before making any decision to fire her.[3]

---

[3]The evidence reflects, however, that even if SFSA had received Dr. Chanales's letter prior to terminating Rhoads, the bank would have taken the same action, because Rhoads's supervisors had reason to disbelieve that she was sick. For example, during the time period culminating in Rhoads's termination — September 1-15, 1993 — she failed to answer her home telephone several times when SFSA officials called her; she did, however, return calls when paged on her beeper. Indeed, during the period of August 14-27, when Rhoads insists she was ill due to cigarette smoke exposure during the August 12 and 18 meetings at the Frederick Center, she used two vacation days but otherwise recorded working 7.5 hours per day on her time sheets. Moreover, the evidence adduced at trial showed that, during the weeks leading up to September 1, Rhoads moved apartments, drove to and attended a half-day orientation session at the University of Maryland in College Park, and signed up for full-time day classes at the university, scheduled to begin September 7.

B.

Upon issuance of a "Notice of Right to Sue" letter by the Equal Employment Opportunity Commission, Rhoads filed this action in a timely manner on June 7, 1994, in the District of Maryland. In her amended complaint against RTC, as conservator for SFSA and receiver for SFSB, Rhoads raised claims under the FMLA, ADA, Montgomery County (Maryland) Human Rights Law, the Maryland Wage and Collection Law, and Maryland state common law. RTC was subsequently replaced as defendant by the FDIC. The district court possessed jurisdiction over this action pursuant to 12 U.S.C. §§ 1441a(l)(1) and 1819(b) (actions in which the FDIC and its predecessor the RTC are parties); 29 U.S.C. § 2617(a) (claims under the FMLA); 42 U.S.C. § 12117 (claims under the ADA); and 28 U.S.C. § 1367(a) (supplemental jurisdiction over state law claims).

The FDIC sought summary judgment on all of Rhoads's claims, and Rhoads filed a motion for summary judgment on her FMLA claim and on an affirmative defense raised by the FDIC regarding damages. On February 28, 1997, the district court granted summary judgment for the FDIC on Rhoads's ADA and state law claims, but denied the FDIC's motion for summary judgment on Rhoads's FMLA claim. The court also denied Rhoads's motion for summary judgment in its entirety. The jury trial on the FMLA claim was held from February 23 through March 4, 1998, at which time the jury returned a verdict for the FDIC and the court entered final judgment. Rhoads subsequently filed a motion for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or a new trial, pursuant to Rule 59(a). The court denied the motion and soon after granted leave to Rhoads's attorney to withdraw from the case.

Rhoads filed a pro se notice of appeal on September 9, 1998. A month later, she filed a motion for relief from judgment in the district court, which the court stayed pending resolution of this appeal. On February 16, 2000, after Rhoads and the FDIC had filed their appellate briefs, we assigned amicus curiae to brief and argue in support of Rhoads's positions. We possess jurisdiction over this appeal under 28 U.S.C. § 1291.

## II.

We have carefully considered Rhoads's contentions that she was entitled to judgment as a matter of law, or at least a new trial, on her claim under the FMLA, 29 U.S.C. §§ 2601-2654, and that the district court erroneously granted summary judgment to the FDIC on her three claims under the employment provisions of the ADA, 42 U.S.C. §§ 12101-12117, 12203, for failure to make reasonable accommodations, discriminatory discharge, and retaliation. With regard to her FMLA claim, the district court required Rhoads to prove to the jury that she suffered from an FMLA-qualifying "serious health condition." *See* 29 U.S.C. § 2611(11). The court also refused to award Rhoads judgment as a matter of law on this issue based on her assertion that the FDIC waived the right to contest it because of SFSA's failure to pursue the FMLA's "second opinion" procedures. *See id.* § 2613(c)-(d). Finding no error, we affirm the district court's decisions on these points. The FMLA claim is examined more thoroughly in Part III.

As for the three ADA claims, the district court granted summary judgment on each of them to the FDIC. The court determined that Rhoads failed to adduce sufficient evidence to prove that she was "disabled" within the meaning of the ADA and, thus, could not support her claims for failure to make a reasonable accommodation and discriminatory discharge. *See* 42 U.S.C. § 12102(2). The court further concluded, with regard to the accommodation claim, that the accommodation sought by Rhoads — the right to take sick leave whenever her asthma and migraines prevented her from working — was "facially unreasonable." *Rhoads*, 956 F. Supp. at 1248. Moreover, with regard to the discriminatory discharge claim, the court ruled that, because of Rhoads's excessive absenteeism, she had "not offered sufficient evidence to establish she was meeting her [employer's] legitimate expectations." *Id.* at 1249. Because we agree that Rhoads failed to make a sufficient showing of disability, we affirm the district court's award of summary judgment to the FDIC on the failure to accommodate and discriminatory discharge claims, without unnecessarily reaching their other elements. These claims are discussed in Part IV.A.

The ADA retaliation claim, however, did not require proof of a disability. The district court granted summary judgment on this claim, concluding that Rhoads failed to establish evidence to rebut the FDIC's legitimate, nondiscriminatory reason for her discharge — excessive unexcused absenteeism — under a burden-shifting proof scheme. We disagree with this determination and conclude that Rhoads not only proffered enough evidence to survive summary judgment under the burden-shifting scheme, but she also established sufficient direct and indirect evidence of retaliation as an alternative avenue of proof. Therefore, we reverse the award of summary judgment to the FDIC on the ADA retaliation claim, and we remand it for further proceedings. This claim is addressed in Part IV.B.[4]

## III.

We first assess the district court's denial of Rhoads's motion for judgment as a matter of law or, alternatively, for a new trial, on her claim that SFSA unlawfully interfered with her exercise of FMLA rights by firing her. *See* 29 U.S.C. § 2615(a)(1) (deeming it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's FMLA rights).[5] The jury concluded that she did not suffer from an FMLA-qualifying "serious health condition." *See id.* § 2611(11). Rhoads contends, however, that she should not have been required to prove that she was afflicted with

---

[4]We have also reviewed the other contentions advanced by Rhoads on appeal, including, inter alia, that the district court erroneously granted summary judgment to the FDIC on her state law claims. Rhoads also challenges the award of summary judgment to the FDIC on the issue of back pay; the district court concluded that the FDIC's back pay liability, if any, was severed after February 1995, when SFSA was sold and Rhoads's job was accordingly eliminated. We find no merit in Rhoads's assertions of error on these various points and, thus, affirm the district court's determinations of them. *See generally Rhoads*, 956 F. Supp. 1239.

[5]Rhoads also contends that the district court erred by denying her pre-trial motion for summary judgment on this claim. However, "this Court will not review, under any standard, the pretrial denial of a motion for summary judgment after a full trial and final judgment on the merits." *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 1995).

such a condition and, regardless, the FDIC waived any right to contest this issue because SFSA failed to follow the FMLA's "second opinion" procedures upon receipt of her physician's certification of her ailments. *See id.* § 2613(c)-(d).

Thus, Rhoads insists, she established as a matter of law that she suffered from an FMLA-qualifying condition, and this issue was improperly submitted to the jury. We review de novo the denial of Rhoads's request for judgment as a matter of law, *see Deans v. CSX Transp., Inc.*, 216 F.3d 398, 400 (4th Cir. 2000), and we review the denial of her request for a new trial for abuse of discretion, *see Freeman v. Case Corp.*, 118 F.3d 1011, 1014 (4th Cir. 1997) (acknowledging that "an error of law constitutes an abuse of discretion").

A.

The FMLA is intended "to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999) (citing 29 U.S.C. § 2601(b)). It entitles eligible employees[6] to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons, *see* 29 U.S.C. § 2612(a)(1), and ensures that these employees will be restored to their same or an equivalent position upon returning to work, *see id.* § 2614(a)(1). A qualifying medical reason is defined as

---

[6]An "eligible employee" is one "who has been employed for at least 12 months by the employer with respect to whom leave is requested . . . for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). At the summary judgment stage, the district court concluded that Rhoads had worked for SFSA for the requisite amount of time, even though she had been employed there for just under 12 months as of her termination. The court so ruled because Rhoads's combined length of service to SFSB and SFSA exceeded 12 months, and because SFSA was a "successor in interest" to SFSB. *See id.* § 2611(4)(A)(ii)(II) (defining an "employer" as "any successor in interest of an employer"); 29 C.F.R. § 825.107 (1993) (providing eight factors for evaluating whether an entity qualifies as a successor in interest). The jury later found that Rhoads worked at least 1,250 hours during the relevant period. This issue, Rhoads's status as an eligible employee, is not raised on appeal.

"a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* § 2612(a)(1)(D). A "serious health condition" is defined, in part, as an illness or impairment that requires continuing treatment by a health care provider, *see id.* § 2611(11)(B), and that also involves a "period of incapacity requiring absence from work . . . of more than three calendar days," 29 C.F.R. § 825.114(a)(2) (1993).[7]

---

[7]The Secretary of Labor possesses authority to promulgate regulations implementing the FMLA. *See* 29 U.S.C. § 2654. Interim regulations took effect on August 5, 1993, while final regulations took effect on February 6, 1995. *See Sims v. Alameda-Contra Costa Transit Dist.*, 2 F. Supp. 2d 1253, 1257 n.2 (N.D. Cal. 1998). Because Rhoads's termination and the related events occurred in September 1993, the interim regulations apply in this case. We defer to the Secretary's interpretation of the FMLA, as expressed in the interim regulations, pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Miller v. AT&T Corp.*, ___ F.3d ___, Nos. 00-1277, 00-1928, 2001 WL 475934, at *8 (4th Cir. May 7, 2001). Further, we recognize that "the expanded final regulations, to the extent they merely amplify the language of the interim regulations, may provide valuable guidance to us as we apply the law to the facts here." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 376 (8th Cir. 2000).

While the interim regulations neither expressly include or exclude asthma and migraines as FMLA-qualifying conditions, the final regulations identify these ailments as conditions that potentially qualify for FMLA leave. *See* 29 C.F.R. § 825.114(a)(2)(iii)(C) (2000) ("A chronic serious health condition is one which . . . [m]ay cause episodic rather than a continuing period of incapacity (*e.g.*, asthma, diabetes, epilepsy, *etc.*)."); *id.* § 825.114(c) (specifying "headaches *other than migraine*" in a list of conditions that ordinarily would not merit FMLA leave (emphasis added)). Moreover, the final regulations provide:

> Absences attributable to incapacity under paragraphs (a)(2)(ii) or (iii) qualify for FMLA leave even though the employee . . . does not receive treatment from a health care provider during the absence . . . . For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack or because the employee's health care provider has advised the employee to stay home when the pollen count exceeds a certain level.

*Id.* § 825.114(e). We recognize that these final regulations would have had no effect on this case, because the jury determined, without reaching

An employee is mandated to provide notice to her employer when she requires FMLA leave. Where the need for leave is unforeseeable, "an employee should give notice to the employer . . . as soon as practicable under the facts and circumstances of the particular case." *Id.* § 825.303(a). At bottom, "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." *Id.* § 825.302(c). The employee, however, "need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed . . . ." *Id.* The employer should inquire further to ascertain whether it is FMLA leave that is being sought and to obtain further details of this leave. *See id.*

An employer has discretion to require that an employee's leave request "be supported by a certification issued by the health care provider of the . . . employee[.]" 29 U.S.C. § 2613(a). "An employer must give written notice of a requirement for medical certification in a particular case . . . ." 29 C.F.R. § 825.305(a) (1993) (internal citation omitted). This certification "shall be sufficient" if it articulates: the date on which the serious health condition commenced; its probable duration; the "appropriate medical facts," within the health care provider's knowledge, regarding this condition; and a statement that the employee is unable to perform the functions of her position. 29 U.S.C. § 2613(b)(1)-(3), (4)(B). The employer must inform the employee of the consequences of failure to provide this certification, *see* 29 C.F.R. § 825.305(c) (1993), and the employer must allow the employee at least fifteen calendar days to submit it, *see id.* § 825.305(a). If the employer views the certification as incomplete, the employer "shall advise" the employee of this belief and "provide the employee a reasonable opportunity to cure any . . . deficiency." *Id.* § 825.305(c).

---

the question of continuing treatment, that Rhoads simply did not experience a period of incapacity requiring absence from work for more than three days. However, the fact that an employee suffers from the specific conditions of asthma and migraines does not mean that she could never qualify for FMLA leave.

If, as in this case, the employer questions the soundness of the certification, the FMLA sets forth procedures for obtaining second, and third, opinions. It provides that "the employer *may* require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider" and, if the first and second judgments differ, that "the employer *may* require, at the expense of the employer, that the employee obtain the opinion of a third health care provider[.]" 29 U.S.C. § 2613(c)(1), (d)(1) (emphasis added).[8] The

---

[8]The statute sets forth the following procedures for obtaining the second and third opinions:

(c) Second opinion

(1) In general

In any case in which the employer has reason to doubt the validity of the certification provided . . . the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer concerning any information certified under subsection (b) of this section for such leave.

(2) Limitation

A health care provider designated or approved under paragraph (1) shall not be employed on a regular basis by the employer.

(d) Resolution of conflicting opinions

(1) In general

In any case in which the second opinion described in subsection (C) of this section differs from the opinion in the original certification provided under subsection (a) of this section, the employer may require, at the expense of the employer, that the employee obtain the opinion of a third health care provider designated or approved jointly by the employer and the employee concerning the information certified under subsection (b) of this section.

(2) Finality

The opinion of the third health care provider concerning the information certified under subsection (b) of this section shall be considered to be final and shall be binding on the employer and the employee.

29 U.S.C. § 2613(c)-(d).

relevant interim regulation similarly provides that, where an employer doubts the accuracy of a certification, the employer "*may* require the employee to obtain a second opinion at the employer's expense. . . . If the opinions of the employee's and the employer's designated health care providers differ, the employer *may* require the employee to obtain certification from a third health care provider, again at the employer's expense." 29 C.F.R. § 825.307(a), (c) (1993) (emphasis added). The final regulations contain substantially similar language. *See* 29 C.F.R. § 825.307(a)(2), (c) (2000).

## B.

Our inquiry with regard to Rhoads's FMLA claim is two-fold and focuses on: (1) whether it was appropriate for the district court to require Rhoads to prove that she suffered from a serious health condition in order to prevail on her FMLA interference claim, *see* 29 U.S.C. § 2611(11); and (2) whether Rhoads established an FMLA-qualifying condition as a matter of law in light of SFSA's failure to pursue the second opinion procedures, *see id.* § 2613(c)-(d). For purposes of our discussion, we assume, without deciding, that Rhoads proffered adequate notice to invoke FMLA protections and submitted sufficient medical certification of her condition. *See* 29 C.F.R. § 825.303(a) (1993); 29 U.S.C. § 2613(a), (b)(1)-(3), (4)(B); *infra* note 9.

## 1.

First, the district court correctly required Rhoads to prove that she was afflicted with an FMLA-qualifying condition, because otherwise she did not have any right under the Act with which her employer could have interfered. *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997) (holding that FMLA interference suits are to be resolved "by asking whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims"); *see also Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1148 (8th Cir. 2001) (requiring plaintiff in FMLA action to prove a serious health condition pursuant to a three-prong objective test); *cf. Miller v. AT&T Corp.*, ___ F.3d ___, Nos. 00-1277, 00-1928, 2001 WL 475934 (4th Cir. May 7, 2001) (affirming summary judgment for plaintiff on question of defendant's liability under FMLA where

plaintiff established, inter alia, that she suffered from a qualifying condition).

Rhoads suggests, instead, that once she met the FMLA's notice and certification requirements, she was undisputedly entitled to leave whether or not she suffered from a serious health condition. She relies on a Department of Labor publication for the proposition that "an 'eligible' employee who has met FMLA's notice and certification requirements . . . may *not* be denied FMLA leave." United States Department of Labor, Employment Standards Administration, Wage and Hour Division, FMLA Compliance Guide (emphasis in original). This guide includes a disclaimer, however, recognizing that it is provided merely as a public service, and that "[t]he Federal Register and the Code of Federal Regulations remain the official source for regulatory information published by the Department." *Id.* Without other support, Rhoads's assertion — that adequate notice and certification alone entitled her to FMLA leave — must fail.[9]

---

[9]The parties disagree over whether Rhoads even rendered sufficient information to put SFSA on notice that she might qualify for FMLA leave. Rhoads contends that she not only provided adequate notice via her September 1, 7, and 13 conversations with SFSA officials, but she also proffered ample certification of her condition within fifteen days of the commencement of her absence, by way of Dr. Chanales's September 2 and 13 letters, despite SFSA's failure to make the requisite written request for this certification. Thus, Rhoads avers, she is entitled to judgment as a matter of law on the notice issue. The FDIC, to the contrary, asserts that Rhoads provided only meager information to her supervisor that was insufficient to invoke the FMLA, and even Dr. Chanale's September 13 letter was too ambiguous to justify FMLA leave.

Due to the format of the special verdict form, the jury never reached the notice issue. That is, Question 2, parts (a) through (c), addressed whether Rhoads suffered from a serious health condition, while Question 3 encompassed whether she met the FMLA's notice obligations. Once the jury determined in Question 2(a) that Rhoads did not encounter a period of incapacity requiring at least a three-day absence from work, and thus that she was not afflicted with an FMLA-qualifying condition, the jury was directed to end its deliberations without addressing further questions on the verdict form. *See* J.A. 2031-34.

Because we conclude that the jury was entitled to find that Rhoads did not suffer from an FMLA-qualifying condition, the notice issue is ren-

2.

Next, we consider whether Rhoads established a serious health condition as a matter of law based on SFSA's failure to follow the FMLA's second opinion procedures. *See* 29 U.S.C. § 2613(c)-(d). On the one hand, Rhoads maintains, inter alia, that to hold otherwise would: undermine the FMLA's procedures for assessing the validity of a leave request; reward miscreant employers; and place employees in need of FMLA leave in the intolerable situation of having to fear that, years down the road, a jury might disbelieve their doctor's opinion. Rhoads relies, in part, on *Sims v. Alameda-Contra Costa Transit District*, 2 F. Supp. 2d 1253, 1263 (N.D. Cal. 1998) (holding that if an initial medical certification "sufficiently establishes . . . a serious health condition, [the employer], having failed to exhaust the second and third-opinion process, is not entitled to challenge that medical finding now"), and the district court's decision in *Miller v. AT&T*, 60 F. Supp. 2d 574, 580 (S.D. W. Va. 1999) (citing *Sims* for the proposition that "[a]n employer who wishes to contest the validity of a medical certification must use the second-opinion procedures of § 2613(c)-(d)").[10] Significantly, the court in *Sims* concluded that the second and third opinion provisions in the FMLA are ambiguous and, thus, it undertook to examine the policies underlying the Act, its legislative history, and its structure and internal logic. *See Sims*, 2 F. Supp. 2d at 1260.

---

dered moot. That is, even assuming that Rhoads provided sufficient notice of her purported need for leave, she was not actually entitled to it, because she was not afflicted with a serious health condition within the meaning of the FMLA.

[10]We affirmed the district court's decision in *Miller* on other grounds. We noted, however, that a second opinion would have been of no use in that case. In *Miller*, the plaintiff sought leave for a severe bout with the flu. Rather than doubting that the plaintiff had the flu and was unable to work, the defendant questioned whether she had received treatment on two or more occasions and whether the flu was an FMLA-covered illness. *See Miller*, ___ F.3d at ___, 2001 WL 475934, at *10 n.13. In this case, conversely, Rhoads's employer did doubt that she was ill and unable to work. Thus, a second opinion might have been useful, if not required.

The FDIC, on the other hand, relies on the Eighth Circuit's determination that "[t]he language of § 2613(c)(1) . . . is merely permissive[.]" *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 860 (8th Cir. 2000). That court concluded, accordingly, that the FMLA does not require "an employer to obtain a second opinion or else waive any future opportunity to contest the validity of the certification." *Id.*

We agree with the Eighth Circuit's assessment in *Stekloff*. In doing so, we recognize that "[u]nder the most basic canon of statutory construction, we begin interpreting a statute by examining the literal and plain language of the statute." *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir. 1996). The FMLA provides only that an employer "may" seek a second, or third, opinion if it questions the validity of an employee's proffered medical certification of her condition. *See* 29 U.S.C. § 2613(c)(1), (d)(1); *see also* 29 C.F.R. § 825.307(a), (c) (1993) (relevant regulation using same terminology, i.e., "may"). Because the term "may" is permissive, the plain language of the statute indicates that an employer who questions the validity of a certification has the option of seeking a second and third opinion, without being required to do so. Moreover, the plain language of the Act does not suggest that an employer must pursue these procedures *or* be forever foreclosed from challenging whether an employee suffered from a serious health condition; and nothing in the legislative history of the FMLA explicitly supports that interpretation. *See Carbon Fuel*, 100 F.3d at 1133 ("Absent explicit legislative intent to the contrary, the statute should be construed according to its plain and ordinary meaning."); *see also Sims*, 2 F. Supp. 2d at 1261 (discussing what the FMLA's legislative history "suggests," without concluding that Congress made its intent clear with regard to the second opinion issue).

This construction of the Act does not mean that there are not potential pitfalls for an employer who chooses not to pursue a second opinion. For example, in *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381-82 (8th Cir. 2000), a precursor to *Steckloff*, the Eighth Circuit affirmed a grant of summary judgment against an employer who failed, as in this case, to seek even initial certification of the plaintiff's purported serious health condition. While the plaintiff's position was supported by contemporaneous notes from her physician indicating that she was

not to work, the employer had to rely on a physician's evaluation made months after the plaintiff was terminated and a psychologist's evaluation of the plaintiff two years later. *See id.* at 382. Under these particular facts, the court concluded that the employer could not show "that there remain[ed] a genuine issue of material fact on the question of Thorson's capacity to perform her job." *Id.*

A critical distinction between this case and the Eighth Circuit's decision in *Thorson* is that, in the latter, there was no evidence independent of the defense's belated evaluations of the plaintiff to indicate that she had been misleading her employer about her health condition. In this case, however, Rhoads's employer had immediate reason to believe that she was not really sick. *See supra* note 3. This evidence, contrasted with the contemporaneous opinion of Rhoads's physician, created a genuine issue of material fact for the jury. Indeed, prior to trial, the district court refused to grant summary judgment to either party, because of the existence of this genuine issue of material fact. Upon hearing the evidence, the jury concluded that Rhoads did not suffer from an FMLA-qualifying condition. For the reasons discussed, Rhoads is not now entitled to judgment as a matter of law or a new trial merely because her employer failed to pursue the FMLA's second and third opinion procedures.

IV.

Rhoads also maintains that the district court erroneously granted summary judgment to the FDIC on her claims under the ADA. We also review de novo this award of summary judgment, "viewing the facts and the inferences to be drawn therefrom in the light most favorable to the nonmovant." *Riddick v. Sch. Bd.*, 238 F.3d 518, 522 (4th Cir. 2000). "Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).

A.

Rhoads's claims under the ADA for unlawful termination and failure to make a reasonable accommodation both require a showing that

she was "disabled" within the meaning of the ADA. *See, e.g., Haulbrook v. Michelin North America, Inc.*, ___ F.3d ___, No. 00-1546, 2001 WL 558152, at *5 (4th Cir. May 24, 2001); *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999).[11] The ADA defines a "disability," in part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]"  42  U.S.C.  § 12102(2)(A).[12]  "Substantially limits" means, inter alia, "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii) (2000). Examples of "major life activities" are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i).

1.

Rhoads maintains that when she suffered the symptoms of asthma and migraine headaches, she was, at times, unable to work, leave her home, care for herself, or perform tasks requiring concentration. Her health conditions, Rhoads avers, also limited her ability to breathe, think, and sleep. Though Rhoads suffered from asthma as an adoles-

---

[11]In a wrongful discharge case under the ADA, a plaintiff makes out a prima facie case by demonstrating that "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook*, ___ F.3d at ___, 2001 WL 558152, at *5.

In a failure to accommodate case, a plaintiff establishes a prima facie case by showing "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." *Mitchell*, 190 F.3d at 6.

[12]"Disability" under the ADA and "serious health condition" under the FMLA are distinct concepts that require different analyses. *See* 29 C.F.R. § 825.702(b) (2000).

cent, her symptoms had been in remission from childhood through the time she began working for SFSB in 1987. One of her physicians, Dr. Chanales, concluded that Rhoads's "asthma was exacerbated by her exposure to cigarette smoke at work." J.A. 416. She was, however, able to work in a smoke-free environment. Indeed, once Rhoads began working at home in May 1993, she was able to perform all of her job responsibilities and assignments. Dr. Chanales explained why he recommended that this arrangement continue:

> [W]hat I suggested is that the company allow her to work at home. Because if she were not exposed to the cigarette smoke, then at that point, she would be able to carry on. Asthma is not something that is a permanently crippling disease. Obviously, we can manage asthma. Many asthmatics work, but they can't work in a place where they get sick.

J.A. 816. Although Rhoads was sometimes exposed to cigarette smoke outside the workplace — such as in shopping malls and restaurants — she would quickly leave those establishments once she noticed the preliminary signs of exposure, *e.g.*, a stuffy nose, sore throat, and tight chest. Moreover, prior to her employment with SFSB and SFSA, Rhoads had engaged in physical activities including bicycling and ballet dancing.

2.

a.

The district court concluded, first, that Rhoads did not establish that her ability to work was substantially limited. The court relied, in part, on our decision in *Gupton v. Virginia*, 14 F.3d 203, 205 (4th Cir. 1994), a case remarkably similar to this one, in which the plaintiff, an employee of the Virginia Department of Transportation ("VDOT"), maintained that her tobacco smoke allergy substantially limited her ability to work.[13] In *Gupton*, the plaintiff asserted that her employer violated her rights by failing to provide a smoke-free workplace. *See*

---

[13]*Gupton* involved a claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794, whose relevant provisions parallel those of the ADA. *See, e.g.*, *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001).

*id.* at 204. We held that, in order to make the required showing that she was disabled, the plaintiff "had to show not merely that her allergy made her 'incapable of satisfying the singular demands of a particular job,' but that it 'foreclose[d] generally [her opportunity to obtain] the type of employment involved.'" *Id.* at 205 (quoting *Forrisi v. Bowen*, 794 F.2d 931, 934, 935 (4th Cir. 1986)) (alterations in original). Moreover, following the district court's ruling on summary judgment in this case, the Supreme Court issued its decision in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999), holding that "[t]o be substantially limited in the major life activity of working, . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice."

We must accordingly agree with the district court that Rhoads has failed to make a sufficient showing that she was substantially limited in her ability to work, where she has established only that she was unable to function in one particular smoke-infested office. As the court explained, "there appears to be no reasonable material or relevant factual dispute concerning [Rhoads's] ability to perform her job requirements at a very high level, provided that she is given the opportunity to perform her work in a smoke-free atmosphere . . . ." *Rhoads*, 956 F. Supp. at 1246. Therefore, Rhoads has not shown, as required, that she is generally foreclosed from jobs utilizing her skills because she suffers from smoke-induced asthma and migraines. *Cf. Gupton*, 14 F.3d at 205 ("While [Gupton] did introduce evidence that her allergy to tobacco smoke made her unable to continue in her current position working as a highway utilities specialist in the VDOT's Fair Ridge office, she presented no evidence that her allergy foreclosed her generally from obtaining jobs in her field.").[14]

---

[14]According to Rhoads, the FDIC "appear[s] to suggest that the *only* place [she] would likely encounter [secondhand smoke] was in [the SFSA] offices as the result of their continued violations of established smoking bans" — a "ludicrous" assertion. Appellant's Br., at 44 (emphasis added). The problem for Rhoads, however, is that she does not attempt to show why this suggestion is preposterous. If, for example, Rhoads had shown that she was generally foreclosed from a broad class of jobs utilizing her skills because of a widespread tolerance of interoffice smoking, she would have bolstered her case.

b.

The district court next addressed Rhoads's contention that other major life activities were also substantially affected by her impairments. The court concluded that, because the substantial limitations on the additional activities cited by Rhoads — including the ability to breathe — all were triggered solely by her workplace environment, the proper inquiry "in these limited circumstances" remained focused on her ability to work. *See Rhoads*, 956 F. Supp. at 1247 (citing for comparison *Mobley v. Bd. of Regents*, 924 F. Supp. 1179, 1187 (S.D. Ga.) (rejecting claim that asthma presents an "obvious" impairment to breathing when symptoms would arise only in one workplace), *vacated*, 26 F. Supp. 2d 1374 (S.D. Ga. 1996) (reopening the case for consideration of further evidence)).

In support of the district court's conclusion, the FDIC additionally relies on *Keck v. New York State Office of Alcoholism & Substance Abuse Services*, 10 F. Supp. 2d 194, 199 (N.D.N.Y. 1998) (concluding that the failure of the plaintiff to allege specific instances of difficulty breathing outside of her workplace, due to her sensitivity to tobacco smoke and perfume, "argues strongly for considering her disability as one limiting the activity of work only"), and *Benson v. Lawrence Livermore National Laboratory*, No. C95-2746 FMS, 1997 WL 651349, at *4 (N.D. Cal. Oct. 14, 1997) (relying on the district court's decision in this case, *Rhoads*, to conclude that the plaintiff's ADA claim failed as a matter of law where she proffered no evidence "to show that her symptoms were triggered by anything but her work environment"), *aff'd*, 163 F.3d 605 (9th Cir. 1998) (unpublished table decision). In another similar case, *Homeyer v. Stanley Tulchin Associates, Inc.*, the Seventh Circuit reversed the district court's dismissal

This brings us to another of Rhoads's contentions, "that an employer who is not willing to provide reasonable accommodation to its employees, cannot simply point to other employers who are willing to provide such accommodation, and establish proof that a disabled individual is not precluded from other employment 'in general.'" Appellant's Br., at 44. It does not escape us that the failure of an employer to enforce a smoking ban is hardly commendable. That failure does not mean, however, that the employer is liable for its actions, or inactions, under the ADA.

of the plaintiff's ADA claim based on substantial limitation of her ability to breathe, where the plaintiff had alleged that her breathing was generally impaired by a respiratory condition. *See* 91 F.3d 959, 962 n.1 (7th Cir. 1996). The court recognized that the plaintiff did not claim that it was only at work that tobacco smoke aggravated her condition, and that there might be many other places where her ailment combined with secondhand smoke limited her ability to breathe. *See id.* The court suggested, however, that if the plaintiff could not prove after discovery that it was not her workplace alone that aggravated her condition, then judgment against her would be appropriate. *See id.*

We accordingly hold that, where an ADA plaintiff asserts that she is disabled based on a substantial limitation of a major life activity other than working, but her condition is aggravated solely by her workplace environment, her claim must be assessed under our foreclosure test for a limitation on working. *See Gupton*, 14 F.3d at 205. In this case, the record shows that, following adolescence, Rhoads functioned normally until 1987, when her employment with SFSB and SFSA caused her to be exposed to secondhand smoke in the workplace. Once she was permitted to work at home, her condition improved and her job performance was unimpeded. There simply is no genuine issue of material fact with regard to the conclusion that any substantial limitations on Rhoads's major life activities — working, breathing, or any others cited by Rhoads — were solely the result of exposure to secondhand smoke in her workplace. Thus, we review her claim as one based only on a substantial limitation on the ability to work, and we apply the *Gupton* foreclosure test. As already discussed above, Rhoads's claim fails under its requirements.

Though Rhoads contends that application of the foreclosure test to claims based on activities other than working contradicts our own precedent, we find her assertion unavailing. Rhoads relies on our decision in *Williams v. Channel Master Satellite Systems, Inc.*, for the proposition that "the general foreclosure test applies only to claims brought under the major life activity of working." 101 F.3d 346, 349 (4th Cir. 1996). In *Williams*, the plaintiff, who had been directed by her doctor not to lift more than twenty-five pounds following an automobile accident, asserted that she was substantially limited in the major life activities of working and lifting. *Id.* at 348, 349. We concluded that the district court erred, in relevant part, by suggesting that

the foreclosure test must be used to determine if a major life activity other than working — in that case, lifting — is substantially limited. *Id.* at 349. Our *Williams* decision is distinguishable from this case, however, because, unlike Rhoads's condition, the *Williams* plaintiff's lifting limitation was not created or aggravated solely by her work environment. If, in this instance, Rhoads had shown that she was debilitated by exposure to secondhand smoke outside of the workplace, then the proper inquiry would have been whether her ability to breathe, etc., was "significantly restricted" as compared to the breathing ability of the "average person in the general population." 29 C.F.R. § 1630.2(j)(1)(ii) (2000). However, because Rhoads established that her abilities to breathe and engage in other life activities were limited only by her exposure to tobacco smoke in the workplace, the proper inquiry is whether, pursuant to the foreclosure test, she was substantially limited in her ability to work.

3.

Rhoads maintains, as alternative bases for establishing a "disability" under the ADA, that she was "regarded as" being disabled, *see* 42 U.S.C. § 12102(2)(C), and that she had a "record of disability," *see id.* § 12102(2)(B). First, in order to demonstrate that she was regarded as disabled, Rhoads was required to show that: (1) her employer "mistakenly believe[d] that [she] has a physical impairment that substantially limits one or more major life activities," or (2) her employer "mistakenly believe[d] that an actual, nonlimiting impairment substantially limits one or more major life activities." *Haulbrook*, ___ F.3d at ___, 2001 WL 558152, at *5 (citing *Sutton*, 527 U.S. at 489). In *Haulbrook*, the plaintiff contended that his employer, Michelin, regarded him as disabled because of his breathing difficulties arising from workplace chemical exposures. *See id.* at ___, 2001 WL 558152, at *5. We determined that Haulbrook could not establish that he was regarded as disabled based on a substantial limitation on his ability to work, because his employer "believed Haulbrook could continue to perform his previous job, but simply believed that he might have to be assigned to perform the same work in a different building." *Id.* at ___, 2001 WL 558152, at *6. Moreover, we concluded that Haulbrook could not prove that he was regarded as disabled based on a substantial breathing limitation, because "the company's internal

communications simply reflect uncertainty about Haulbrook's condition." *Id.* at ___, 2001 WL 558152, at *7.

For similar reasons, we agree with the district court's conclusion in this case that Rhoads failed to show that her employer erroneously believed that she was substantially limited in her ability to work, because "the record indisputably reveals SFSA thought the plaintiff was capable of performing her job in a smoke-free environment[.]" *Rhoads*, 956 F. Supp. at 1247. Furthermore, we conclude that Rhoads cannot establish that her employer mistakenly believed that she was substantially limited in other major life activities, such as breathing, as the evidence shows, at best, that SFSA officials knew she suffered from smoke-induced asthma and migraines, but doubted her declarations pertaining to the severity of her condition.

Next, in order to prove that she had a record of disability, Rhoads was required to establish that she had "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k) (2000). Contrary to Rhoads's assertion that she had a record of disability, the undisputed evidence reflects that, until starting work for SFSB, Rhoads had not suffered the effects of asthma and migraines since childhood, and she had been able to engage in activities like bicycling and ballet dancing. Thus, Rhoads's contention falters for lack of substantiation.

In summary, Rhoads has failed to establish that she was "disabled" within the meaning of the ADA, either because of being afflicted with an actual disability, being regarded as disabled, or having a record of disability. Therefore, we must affirm the district court's award of summary judgment to the FDIC on her ADA claims for failure to make a reasonable accommodation and discriminatory discharge.

### B.

Finally, Rhoads contends that her termination constituted an act of retaliation in violation of the ADA. This basis of recovery does not require that the claimant be disabled. Rather, the ADA provides that "[n]o person shall discriminate against *any individual* because such individual has opposed any act or practice made unlawful by this

chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a) (emphasis added). In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir. 1999) (outlining the alternative avenues of proof by which an aggrieved employee can prove a Title VII violation); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) (recognizing that "[b]ecause the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose — the prohibition of illegal discrimination in employment — courts have routinely used Title VII precedent in ADA cases").

On the one hand, "an employee may utilize 'ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue.'" *Brinkley*, 180 F.3d at 607 (quoting *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992)). To avoid summary judgment, "the plaintiff 'must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Id.* (quoting *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988)) (alteration in original). "'What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Id.* (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995)).

On the other hand, under the burden-shifting method of proof, to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action. *See Haulbrook*, ___ F.3d at ___, 2001 WL 558152, at *8; *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997). The employer then has the burden "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Beall*, 130 F.3d at 619. If the employer does so, the plaintiff "must demonstrate that the proffered reason is a pretext for forbidden retaliation." *Haulbrook*, ___ F.3d at ___, 2001 WL 558152, at *8. The plaintiff always bears the ultimate burden of per-

suading the trier of fact that she was the victim of retaliation. *See Beall*, 130 F.3d at 619.

1.

The dispute culminating in this termination came on the heels of Rhoads's consultation with an attorney and threats of legal action against the bank, in addition to her numerous requests over the years for accommodation of her health conditions (including enforcement of the smoking ban). Rhoads alleges that, during the August 18, 1993 meeting with SFSA officials, including Jones:

> I told them that I felt I was being backed into a corner, and had consulted a lawyer as to my rights. Mr. Jones became upset and responded that I would regret that I had done so.

J.A. 1021. Then, in an August 20 letter, Rhoads's lawyer requested that Rhoads be permitted to continue working at home until the no-smoking policy at the Frederick Center proved successful, recognizing that the new policy was untested and "Standard Federal's record in enforcing existing smoking regulations does not inspire confidence." J.A. 217. In further correspondence of September 13 — following Jones's September 10 letter threatening disciplinary action against Rhoads — her attorney admonished that "this situation raises the issue of whether Standard Federal is living up to its obligations under the Americans with Disabilities Act and similar local laws" and warned that SFSA might be violating the FMLA. J.A. 267. In response, Jones wrote in his September 13 letter to Rhoads that, so long as she was an SFSA employee, the bank would communicate with her and not her lawyer. Jones subsequently recommended firing Rhoads and served on the SFSA committee that considered the matter, though he abstained from actually voting on her termination.

SFSA's attendance policy provided the following guidelines for dealing with excessive absenteeism, to be monitored in twelve-month cycles: after four to five absences, a written warning is issued; after six to eight absences, the employee is placed on probation; and, where there are "over ten" absences, termination procedures may be initiated. *See* J.A. 113-14. In this case, Rhoads maintains that SFSA officials both began termination proceedings and approved her discharge

before she accumulated more than ten absences. Moreover, SFSA's own documents show that "there are situations where employees have been absent more than ten days and have not been terminated." J.A. 292. Relatedly, the SFSA sick leave policy directed employees, when they were too ill to work, to notify their supervisors as soon as possible. For absences exceeding five consecutive workdays, employees were mandated to provide a doctor's note. For absences of more than ten days, employees faced termination unless they requested disability leave and submitted supporting medical documentation. In practice, SFSA was known to allow employees to document their illnesses after they returned to work from sick leave, although Rhoads was denied this privilege.

### 2.

The district court concluded, without considering the first avenue of proof (sufficient direct and indirect evidence of retaliation), that Rhoads failed to establish a claim under the second avenue of proof (the burden-shifting method). According to the court, even assuming that Rhoads made out a prima facie case of retaliation, she failed to demonstrate that the FDIC's proffered reason for her termination — her excessive, unexcused absenteeism — was untrue and, thus, a pretext for discrimination. That is, the court determined that Rhoads was merely the target of "normal sanctions for misconduct" from which she could not be shielded by pursuing a discrimination suit. *See Rhoads*, 956 F. Supp. at 1250 (quoting *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 366 (4th Cir. 1985)). Moreover, the court was impressed by evidence that, even if Jones admonished Rhoads that she would be sorry for consulting a lawyer, he attempted to accommodate her after making that statement and abstained from voting for her termination. And the court noted that, though "SFSA managers . . . testified that SFSA may have applied its sick leave policy more stringently against Rhoads than other employees, all included the important statement that the disparity in Rhoads's treatment . . . was due to her lengthy prior absences[.]" *Id.* at 1251. This testimony was, the court concluded, "a completely adequate rationalization in the view of this Court." *Id.*

Rhoads insists, however, that she made a sufficient showing of retaliation under both avenues of proof. First, she maintains that she

proffered adequate direct evidence by way of Jones's statement that she would regret consulting a lawyer. According to Rhoads, this statement was made on August 18, 1993. Two days later, her attorney submitted a letter requesting that she be permitted to continue working at home until the new no-smoking policy at the Frederick Center was deemed effective. Then, on September 13 — two days before Rhoads's termination — her lawyer corresponded with SFSA again, this time warning that the bank might be violating the ADA and other laws. Jones soon after recommended Rhoads's discharge and served on the committee that dealt with it, even if he did abstain from voting on this matter.

Moreover, Rhoads contends that she made a sufficient showing of retaliation under the burden-shifting method of proof to survive summary judgment. In support of her prima facie case, Rhoads avers that: she engaged in protected activity by, inter alia, requesting accommodations for her purported disability, such as enforcement of the smoking ban and permission to continue working at home; SFSA acted adversely against her by terminating her; and her protected activity was causally connected to her discharge, as evidenced by their close temporal proximity. To rebut the FDIC's explanation that Rhoads was fired for excessive unexcused absenteeism, she proffered evidence that SFSA sick leave policies were applied more stringently to her than other employees, as well as the direct evidence already discussed above.

We conclude that this direct evidence of a stated purpose to discriminate (Jones's purported threat to Rhoads regarding her consultation with a lawyer) coupled with the related indirect evidence (the timing of her attorney's subsequent letters to SFSA in relation to the bank's decision to fire her, and Jones's involvement in that decision), create a genuine issue of material fact with regard to Rhoads's retaliation claim. Additionally, we agree with Rhoads that summary judgment was inappropriate under the burden-shifting analysis, and that she established a sufficient prima facie case of discrimination. *See, e.g.*, *Carter v. Ball*, 33 F.3d 450, 460, (4th Cir. 1994) (recognizing that, where a plaintiff shows that he was discharged soon after engaging in protected activity, the evidence is sufficiently suggestive of retaliatory motive to at least make out a prima facie case of unlawful discrimination).

In so holding, we find ourselves in disagreement with the district court over whether there is adequate evidence to rebut the FDIC's legitimate, non-discriminatory reason for Rhoads's discharge. Though the district court was persuaded that no reasonable fact finder could conclude that Rhoads was the victim of retaliation, this conclusion was reached by improperly drawing inferences in favor of the FDIC. *See, e.g.*, *Rhoads*, 956 F. Supp. at 1251 ("Jones, rather than harassing Rhoads, appears to have tried to accommodate[ ] her wishes and to have abstained from voting for her termination. In those circumstances, there is a strong inference that Jones had no discriminatory animus against Rhoads."). At the summary judgment stage, the evidence must be viewed in the light most favorable to Rhoads. *See Riddick*, 238 F.3d at 522. Viewed in the proper light, the record establishes that once Rhoads failed to heed Jones's warning not to consult an attorney, she was terminated, purportedly for excessive unexcused absenteeism, even though her fellow employees had not been discharged for the same conduct. *Cf. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999) (concluding that the plaintiff's factual assertions were adequate to state a discrimination claim where the evidence showed, inter alia, that an absenteeism policy used to exclude plaintiff from a school choir had not been uniformly applied). While SFSA officials attempt to justify this inconsistent treatment based on Rhoads's lengthy prior absences, they fail to acknowledge that, in the months prior to September 1, 1993, Rhoads had been working at home by mutual agreement with a bank supervisor. Although Rhoads may not ultimately prevail on her retaliation claim, there is certainly sufficient evidence to overcome the FDIC's motion for summary judgment.

## V.

For all of the foregoing reasons, we reverse the district court's award of summary judgment to the FDIC on Rhoads's retaliation claim under the ADA, but we affirm the court's determinations of the remainder of her claims. *See Rhoads v. FDIC*, 956 F. Supp. 1239 (D. Md. 1997); Order of Judgment, No. 5-94-1548 (D. Md. Mar. 4, 1998); Order, No. B-94-1548 (D. Md. Aug. 12, 1998).

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*