**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1377**

TINA SMITH,

        Plaintiff – Appellant,

   and

ROBERT FARNSWORTH,

        Plaintiff,

      v.

CSRA; MERRICK B. GARLAND, Attorney General,

        Defendants – Appellees,

   and

GENERAL DYNAMICS CORPORATION,

        Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, Senior District Judge. (1:18-cv-00915-LO-JFA)

Argued: May 5, 2021                      Decided: September 1, 2021

Before GREGORY, Chief Judge, QUATTLEBAUM, Circuit Judge, and KEENAN, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Quattlebaum and Senior Judge Keenan joined.

——————————

**ARGUED:** Joshua Harry Erlich, THE ERLICH LAW OFFICES, PLLC, Arlington, Virginia, for Appellant. Rebecca Sara Levenson, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Joseph Richard Ward, III, KULLMAN FIRM, PC, Englewood, Colorado, for Appellees. **ON BRIEF:** Davia Craumer, Katherine L. Herrmann, THE ERLICH LAW OFFICE, PLLC, Arlington, Virginia, for Appellant. G. Zachary Terwilliger, United States Attorney, Meghan Loftus, Assistant United States Attorney, Catherine M. Yang, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee Merrick B. Garland.

——————————

GREGORY, Chief Judge:

Tina Smith ("Smith") appeals from the district court's entry of summary judgment in favor of government contractor CSRA, Inc. ("CSRA") and the Attorney General of the United States[1] in his capacity as the federal official in charge of the Drug Enforcement Administration ("DEA"), on claims of disability discrimination and retaliation in violation of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 791 *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. We affirm the district court's summary judgment as to Smith's disability discrimination claim but vacate summary judgment as to her retaliation claim and remand for further proceedings.

## I.

### A.

We "review[ ] de novo the district court's order granting summary judgment." *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 565 n.1 (4th Cir. 2015). "A district court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 568 (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted). In determining whether a genuine dispute of material fact exists, "we view the facts and all justifiable

---

[1] Smith's Second Amended Complaint names Matthew Whitaker, the Acting Attorney General of the United States at the time of its filing. The Court substituted Attorney General Merrick Garland as the named party, in his capacity as the current Attorney General of the United States.

3

inferences arising therefrom in the light most favorable to . . . the nonmoving party." *Id.* at 565 n.1 (internal quotation marks omitted).

Smith is a geospatial intelligence expert who in 2013 began working with DEA as a subcontractor assigned to the agency's geospatial intelligence program (the "Program"). Smith worked at the direction of DEA's Chief Technology Officer Mark Shafernich at DEA's Sterling, Virginia Data Center.

At the beginning of their working relationship, Smith informed Shafernich that she has a disability that adversely affects her mobility, limiting her ability to stand, walk, sit, ascend and descend stairs, and drive. Shafernich authorized accommodations for Smith's disability, including (1) a remote work "token" that gave her secure access to DEA's sensitive but unclassified infrastructure while working offsite, and (2) onsite parking at the Sterling Data Center, where DEA provided her with an office and equipment to perform her duties. DEA retained sole authority to activate and/or revoke its remote tokens.

In 2015, Smith formally requested (with supporting medical documentation) and was granted an accommodation for her disability that authorized her to work remotely 50 percent of the time. From this point through 2017, Smith received positive performance reviews from Shafernich as well as other DEA and contractor employees and consultants.

In 2016, CSRA became the prime contractor for an information technology contract with the Department of Justice and assumed responsibility for supplying the subcontracted labor under its contract with DEA. CSRA Program Manager Scott Barnhart coordinated the DEA task order as part of the prime contract. Barnhart did not manage her day-to-day

4

activities or schedule. Instead, DEA directed her work in the form of identified deliverables.

When CSRA took over, Shafernich requested to retain Smith in the Program. On June 7, 2016, Smith, through her company, Smith Global, LLC, entered into a subcontract (the "Consultant Agreement") with CSRA to continue in her position. The Consultant Agreement provides in part:

> [T]he Consultant's relationship to [C]SRA shall be to provide services on an independent contractor basis. Nothing in this agreement should be construed to create a . . . employer-employee relationship. Consultant (a) is not the agent of [C]SRA; . . . and (c) will not be entitled to and waives any right to any benefits that [C]SRA makes available to its employees, such as group insurance, holidays or paid time off, and 401(k) eligibility and match. Consultant will not be entitled to or covered by worker's compensation coverage, unemployment insurance or any other type or form of insurance normally provided by [C]SRA for its employees. [C]SRA will not be responsible for withholding federal income or social security taxes from the fee paid to the Consultant.

J.A. 101.[2]

The Consultant Agreement further provided that either party could terminate the Agreement "at any time and without cause," J.A. 103, and that the "Place of Performance" included "Various sites as directed by Customer and/or [C]SRA." J.A. 100. The Agreement also provided that DEA determined the work hours for performing the contracted services. Smith's position did not change in substance or structure under the Consultant Agreement. She continued to work, with accommodations, under Shafernich's supervision at the Data Center alongside both CSRA and DEA employees.

---

[2] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

In April 2017, Smith met with Maura Quinn, DEA's Acting Deputy Assistant Administrator with the Office of Information Systems, to brief her on the Program. According to DEA, Quinn became dissatisfied during the meeting when Smith was unable to answer questions about the Program. As a result, on April 25, 2017, Quinn directed that Smith and her project partner, CSRA employee Joseph Marceau, begin reporting to DEA headquarters on May 1, 2017, to work under the supervision of DEA Project Manager Kevin Tseng and Section Chief Mildred Tyler.

Smith believed the transition to DEA headquarters was so that the contractors could "fully brief" the headquarters team "to make sure they understood where the project was and the next steps for moving forward" and could "get[] control" of the Program's resources. J.A. 539, 797, 799. But according to Quinn, she moved the Program from the Sterling Data Center to DEA headquarters because she had formed the impression that Smith's services may not have been serving DEA's interests and needs, and that Smith may not have the technical skills necessary to achieve DEA's goals for the Program.

For Quinn, the meeting with Smith also confirmed her concerns with Shafernich's oversight of the Program in Sterling. She concluded that new leadership of the Program at DEA headquarters was needed to ensure the Program better met DEA's law enforcement needs, particularly the need to expand access to geospatial intelligence materials to agents throughout the DEA. Quinn had also learned that the Program duplicated the efforts of another DEA geospatial program in El Paso, Texas which, unlike the Program in Sterling, was utilizing "the latest technology." J.A. 1202. Quinn decided it was necessary to

6

consolidate the programs, and Tseng was tasked with managing the transition and decommissioning the Sterling Program.

Upon learning of the transition to a new task manager and that she would be required to work at DEA headquarters, Smith lobbied to maintain her previous remote work and task monitoring arrangement. Before the change in work location took effect, Smith stated that there was "a case for location flexibility based on the task priorities and [her] physical disability" and reminded Barnhart and Shafernich that she "works remote[ly] 50% of the time due to physical disability, per medical provider letter to DEA." J.A. 848. Barnhart responded to Smith, explaining that the matter "will need to be worked and passed through [Tyler] and [Tseng]." J.A. 848.

Barnhart's response was consistent with CSRA's informal policy for handling subcontractor accommodation requests. CSRA refers the subcontractor to the company that employs them, facilitates communications between that company and the government client to whom the subcontractor is assigned, and lobbies the government client for the accommodation. DEA's accommodation policy (the "Accommodation Policy") establishes procedures for considering employee accommodation requests but makes no reference to contractors. DEA's EEO office analyzes whether a contractor's accommodation request that "is otherwise reasonable and properly supported by medical documentation can and should be provided by DEA as opposed to the contractor's company." J.A. 338. DEA expects the contract representative for the prime contractor company, in this case Barnhart, to be involved in accommodation discussions.

DEA officials did not respond to Smith's request to continue her remote work arrangement before she was required to report to DEA headquarters. On May 2, 2017, the first day she reported to work at that location, Smith asked Tyler for permission to park onsite and to continue working remotely up to 50 percent of the time based on the accommodation Shafernich had approved. Smith supported her request with an updated letter from her physical therapist describing her current physical limitations. J.A. 511. Without a parking pass, Smith was forced to park either at an adjacent hotel or shopping mall. Both options required her to walk a distance she was unable to manage due to her disability. Consequently, Smith intermittently continued to work remotely while awaiting formal approval of her accommodation despite notification that she was not authorized to do so.

Tyler responded to Smith's request on May 5, stating, "I cannot approve your remote work request until we are able to review the contractual agreement (ITSS-4 at DOJ) that addresses your special needs. We are also seeking information to determine the appropriate documentation required for such requests." J.A. 855. Tyler ultimately rejected Smith's documentation from her physical therapist and demanded a letter from her primary care physician.

Tyler then referred Smith's accommodation request to Michelle Bower (Quinn's deputy) and DEA Section Chief Evelyn Wideman, who coordinated with DEA's EEO office. DEA reviewed its contract with CSRA and concluded it could not grant the request. First, the contract did not expressly provide for remote work. Although Shafernich had previously authorized Smith to work remotely, DEA concluded that he had no authority to

8

do so. Second, DEA's Accommodations Policy did not apply to Smith because she was a CSRA contractor, not a DEA employee. Finally, the terms of DEA's building lease limited the issuance of parking passes to employees.

On May 7, 2017, Smith asked to meet with Barnhart and Tyler at DEA headquarters to discuss her schedule for the next thirty days as well as accommodations for her disability. She emphasized that resolving the issue was "key for this transition to work." J.A. 852. The next day, Tyler informed Smith that the DEA could not provide her a parking pass because she was a contractor and not a DEA employee. Smith emailed Barnhart and Shafernich for guidance, reiterating that she was physically unable to walk "back and forth from the mall without significant degeneration" and needed reasonable accommodations at DEA headquarters to continue working there. J.A. 851. Shafernich forwarded Smith's email to Bower and asked that Smith be accommodated.

Having heard nothing more from Tyler, on May 10, 2017, Smith emailed her about her accommodation request. "I hope there will be some handicap accommodations soon so I can continue working and not stressing over the time being lost. My apologies for my frustrations, this is a disability I have no control over." J.A. 850. Tyler responded that DEA and CSRA management would discuss her situation later that morning and would provide guidance going forward. Smith was not invited to participate. When Smith inquired about the outcome of the discussion, Tyler referred her to Barnhart, who responded:

> Tina – DEA is interested in having you support them in a part time capacity going forward. They can not [sic] accommodate your parking request as they consider you a non-employee. They value what you bring and wish to

9

continue working with you and this is why they will adjust to a part time posture, to help with your physical demands. They are assembling this desire via the JMD COR [Justice Management Division Contracting Officer's Representative], per my request, so we have their formal intention. They would like you onsite three days a week and a schedule that is pretty firm, say Monday, Tuesday, Thursday. Once I have their formal intent I'll host a call between myself, CSRA subk, and you to answer any questions and ensure we are tracking.

J.A. 503.

Smith responded, "[I]t is unlawful to discriminate against me for my known disability that I have been working with at DEA for 4 yrs. I do not agree to them discontinuing my reasonable accommodations and thinking it is ok to now cut my hours in half because I am physically disabled. Take no further steps on this action." *Id*.

Despite her disapproving response to Barnhart's email, Smith nonetheless provided the medical documentation Tyler demanded on May 15, 2017. Her primary care physician's May 9, 2017, letter stated:

Ms. Tina Smith has been my patient for several years. She has a history of chronic back pain with functional limitations following a 2009 surgery for multiple level spinal fusions (at the level of L3-4-5-S1). She has been under the constant care of a physical therapist where she is working on improving her function.

Ms. Smith continues to have difficulty with walking, sitting or standing for extended periods of time due to the back spinal fusions and cervical disc degenerations. These activities lead to weakness, numbness/tingling, and pain in the extremities.

Over the last several years, she has had the accommodation to work 50% of the time at a remote location where she is able to fully perform her job tasks as well as preserve her joint function by decreasing the gravitational load on the spine. She also requires a handicap parking space to limit the need to walk distances when coming in to [sic] the office.

J.A. 510.

On May 19, 2017, JMD COR documented its formal proposal outlining the parameters of a part-time scheduling accommodation for Smith as Barnhart said it would. Unlike the proposed accommodation Barnhart described in his email, which Smith interpreted as limiting the maximum number of hours she could work, the formal proposal allowed Smith to work up to five days a week at her discretion. Notably, the proposal still failed to offer Smith a parking pass. In any event, neither DEA nor CSRA communicated this formal offer of accommodation to Smith; Barnhart's May 10, 2017, email to Smith was the last communication she received from DEA or CSRA regarding a disability accommodation. In the meantime, Smith continued to report to DEA headquarters only intermittently–nine days in May and three days between June 1 and June 11. She continued to work remotely and billed DEA for fourteen days of unauthorized telework. CSRA initially expressed support for Smith's accommodation requests, but because they involved DEA facilities and DEA consent, Barnhart and CSRA pressed Smith to work onsite at headquarters as DEA had instructed until her accommodation request was resolved.

DEA alleges that during this time, DEA officials developed concerns about Smith's technical skills and her response to the relocation of the Program to DEA headquarters under Tseng's and Tyler's management. DEA leadership described Smith's conduct as "stonewalling" and lacking a "collaborative spirit." J.A. 1684, 1686. According to DEA, Smith often refused to complete tasks Tseng and Tyler requested or to provide the deliverables they asked for, or sometimes provided them in a piecemeal and disorganized fashion. She chose instead to work on matters she prioritized rather than help them learn about the Program or respond to their list of priorities. Smith continued to attend offsite

11

meetings that DEA determined were not in its interests, refused to use the required time tracking system for subcontractors, and did not provide required weekly status reports. By her own admission, Smith found the tasks Tyler and Tseng asked her to complete "silly," "outlandish," "too much work," and "not a smart business decision." J.A. 1325–26, 1463. And despite DEA's repeated instructions that she was not authorized to telework, Smith continued to work remotely.

On May 23, 2017, Tyler emailed Barnhart that she had met with Smith to discuss her job duties in support of the Program. In response to another reminder that remote work was prohibited, Smith told Tyler that she "could only come into the office once a week and/or daily with a parking permit due to her disability." J.A. 205. Smith requested a meeting with Tyler, Barnhart and the EEO office to discuss her pending accommodation request. Tyler asked Barnhart to discuss the proposed meeting with Smith and to schedule it if CSRA, as the prime contractor, wanted to "bring these issues up for discussion with the government." *Id*.

CSRA did not schedule the meeting Smith requested. On May 26, 2017, Barnhart instead arranged a conference call between himself, Smith, and CSRA's HR Director, Colleen Bjork. Bjork informed Smith she was required to report to DEA headquarters five days per week, and because she was not, she was not meeting DEA's expectations or satisfying the requirements of her role. Thus, Smith had "to make a decision" about "looking for another position" because DEA would not accommodate her requests. J.A. 1565. Smith requested a week to respond. J.A. 204, 1565. Barnhart memorialized the meeting in an email to Tyler, reporting that he spoke with Smith and explained that "CSRA

12

is not obligated to provide accommodations for her and neither is the Government. Regardless of what has happened before the requirement for her role has changed and she needs to make a decision if she wishes to continue or not. Tina asked for a week to make this decision." J.A. 204.

On May 29, 2017, Smith filed a complaint with DEA's EEO office alleging the agency's failure to accommodate her disability. Just two days later, on May 31, 2017, Tyler directed Barnhart to retrieve "all government equipment . . . being used to support [Smith's] remote access," including her remote work token. J.A. 480. The following day, Barnhart instructed Smith to return the remote token upon her return to DEA headquarters. On June 7, 2017, before returning the token, and despite instructions to raise concerns with Barnhart and Tseng, Smith asked Quinn directly if she should keep the token. Tyler responded on Quinn's behalf that "[a]s discussed with you and [Barnhart] on a few occasions, remote access is not an option for you." J.A. 528.

Then, within a matter of days, Quinn revoked Smith's security clearance, and CSRA terminated the Consultant Agreement. In the days prior to this action—as early as June 1—Tyler and Barnhart had discussed terminating Smith's contract with CSRA. Tyler told Barnhart that once he had retrieved the government equipment supporting Smith's remote work and Tseng had access to Smith's work files, "it will be your call to release Tina on Friday, June 2nd." J.A. 479. But then on June 5, DEA's EEO office issued Smith a parking pass that would permit her to park in the DEA headquarters parking garage. On June 7, Tyler asked for "an update on [his] decision to release" Smith. J.A. 479-80. But Barnhart had taken no action. He had been surprised to learn that Smith had received a

13

parking pass. He informed Tyler that he was prepared to fire Smith on June 5 but "deferred from that action" when he learned the parking accommodation had been granted. J.A. 479. "[S]ince our discussion with [Smith] was to arrive and report to work at headquarters everyday [sic] or resign" and "[w]ith the parking pass approval it appeared that this matter resolved itself." *Id.*

Just two days later, on Friday, June 9, 2017, Quinn informed Barnhart that DEA intended to revoke Smith's security clearance. Quinn instructed Barnhart to let Smith complete the workday and to inform her of the revocation over the weekend. Barnhart informed Smith as directed on Sunday, June 11, 2017. CSRA terminated its Consultant Agreement with Smith the following day. Without her security clearance, she was no longer able to provide contracted work at DEA headquarters. Smith asked DEA and CSRA to explain why her security clearance had been revoked but received no response.

Quinn did not offer Barnhart any explanation for her decision to revoke Smith's security clearance. Quinn's email correspondence, however, indicates that on June 2, 2017, EEO Program Manager Charmaine McDaniel ("McDaniel") contacted Quinn regarding an "EEO issue" involving Smith. After speaking to one EEO counselor directly, Quinn scheduled a teleconference with McDaniel to discuss the matter on Monday, June 5. *See* J.A. 929–31. Additionally, on June 6, Tyler forwarded Quinn a June 5 email she received from McDaniel. McDaniel informed Tyler that she was conducting a limited inquiry regarding an informal EEO complaint Smith filed against DEA based in part on the agency's failure to accommodate her disability by refusing her request to work remotely and denying her a parking pass. McDaniel requested an interview with Tyler as part of the

14

investigation of the complaint. J.A. 921. Tyler forwarded the email to Quinn with the message, "FYI." *Id*.

After Smith's departure, Quinn stated she revoked Smith's security clearance because she made statements at a June 7, 2017, meeting indicating that she was storing DEA documents on her personal computer in violation of the DEA's information security policy. But a June 16, 2017, memorandum Tyler prepared to document DEA's concerns with Smith's "support and attendance" makes no mention of a security violation resulting in the revocation of Smith's security clearance. It does, however, document DEA's concern about Smith working offsite. Tyler noted that Smith reported 164 hours of work on her timesheets for the month of May but had worked on site at DEA headquarters 11 days, the equivalent of 88 "validated" work hours. J.A. 793–94. Tyler outlined other concerns with the contract support Smith provided, including that she was "not cooperative or communicated well in providing information and/or data to the new government Project Manager that has hindered progress on the project," and was "resistant [sic] in providing and/or responding" to 'numerous' requests," for various types of information about the Program. J.A. 794-95.

B.

Smith filed a civil action alleging disability discrimination and retaliation in violation of the Rehabilitation Act against DEA, and in violation of both the Rehabilitation Act and the ADA against CSRA. She alleged CSRA and DEA "violated [her] right to reasonable accommodation of her disability," J.A. 27, and terminated her in "reprisal for having opposed the discriminatory actions about which she had complained." J.A. 28.

15

Following discovery, CSRA and DEA filed separate motions for summary judgment. CSRA argued that Smith could not pursue a claim under the Rehabilitation Act against CSRA, and that her ADA claims failed because Smith was an independent contractor and ultimately could not show that CSRA violated the ADA. DEA argued that the court, without deciding whether DEA was Smith's joint employer, should find that Smith's claims failed as a matter of law because she could not show that DEA failed to provide a reasonable accommodation, or that DEA terminated her services due to retaliatory animus rather than performance issues, including Quinn's belief Smith had violated DEA's information security policy.

The district court granted both motions for summary judgment. With respect to Smith's claims against CSRA,[3] the court held that the ADA did not apply to Smith because "only qualified individuals," as defined in the ADA, "are entitled to [its] protections," J.A. 1002; *see Jacobs*, 780 F.3d at 572. Applying both the 11-factor independent contractor test set forth in *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 982 (4th Cir. 1983), and the 9-factor joint employer test of *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 414 (4th Cir. 2015), the court concluded that Smith was an independent contractor, not a CSRA employee, and that CSRA was not Smith's "joint employer" with

---

[3] At the time of the court's order, Smith had withdrawn her Rehabilitation Act claim against CSRA. The district court noted that the Rehabilitation Act does not provide a private right of action under Section 503 of the Act, *see Painter v. Horne Bros., Inc.*, 710 F.2d 143 (4th Cir. 1983); and that CSRA is not subject to Section 504 of the Act. *See DeVargas v. Mason & Hangar-Silas Mason Co.*, 911 F.2d 1377, 1383 (10th Cir. 1990) (government contractors "do not fall within the ambit of section 504 of the Rehabilitation Act"). J.A. 1001.

DEA. The ADA "does not protect independent contractors from discrimination based upon disability." J.A. 1002; *Ratledge v. Sci Applications Int'l Corp.*, No. 1:19-CV-239, 2011 WL 652274, at *2 (E.D. Va. Feb. 10, 2011), *aff'd*, 452 F. App'x 348 (4th Cir. 2011).

The district court first found that based on its application of the *Garrett* factors, Smith was an independent contractor. Applying "agency principles and examin[ing] the 'economic realities' of the relationship," *see Chamberlain v. Securian Fin. Grp., Inc.*, 180 F. Supp. 3d 381, 391 (W.D.N.C. 2016) (quoting *Garrett*, 721 F.2d at 981), the court considered that CSRA was engaged in the business of fulfilling government contracts, and that to fulfill its contract with DEA, it in turn contracted with Smith, a geospatial intelligence subject matter expert whose work product was deliverable directly to DEA. Further, the court reviewed the express contract terms governing Smith's relationship with CSRA, including terms referring to her as an independent contractor terminable at will and not subject to the withholding of federal taxes or entitled to employee benefits. The court concluded that these terms reflected the parties' "clear intent to maintain an independent contractor relationship." J.A. 1003.

But the district court found *Garrett*'s "control" factors most persuasive and concluded that CSRA lacked control over Smith. *See Butler*, 793 F.3d at 409, 414 ("Fourth Circuit has consistently focused on control" as "the 'principal guidepost' in the analysis"). The court noted CSRA did not manage the work Smith performed for DEA. DEA, not CSRA, determined the work requirements and how they were to be performed, provided Smith's equipment, and set the location for the performance of the work. Further, the court found that Smith did not readily respond to work-related directives given by CSRA

17

employees. Considering these factors in total, the court found that Smith was an independent contractor not entitled to ADA protections from CSRA.

In reaching this conclusion, the district court rejected Smith's argument that "CSRA's liability arises from its joint employer relationship with DEA." J.A. 1004. Examining the *Butler* factors, particularly those it found most important in determining the extent of an entity's control of an employee, it concluded that although CSRA had contractual authority to terminate Smith's contract, it was not her joint employer. The court determined that CSRA in fact had minimal control over Smith and it was DEA that directly caused the termination of her contract. CSRA terminated Smith's contract only after she was rendered incapable of fulfilling her contractual obligations to DEA. The court considered other facts as well, including that CSRA issued Smith's paycheck and purportedly handled employee discipline, but found them unpersuasive in light of CSRA's lack of ultimate control.

In sum, the district court, finding Smith was an independent contractor and that CSRA was not her joint employer with DEA, held that Smith was not a covered employee for purposes of the ADA, which protects only "qualified individuals." *See* 42 U.S.C. § 12112(a). Because "there is no genuine dispute of material fact that [Smith's] relationship[] with CSRA [did] not fall within the purview of the ADA, the claims against CSRA fail as a matter of law." J.A. 1006.

Next, in granting DEA's motion for summary judgment, the district court determined that it need not determine whether the Rehabilitation Act and the ADA were

18

applicable to Smith because her claims failed as a matter of law.[4]  J.A. 1006.  The court first found that there was no genuine dispute as to whether DEA had refused to accommodate Smith, noting that DEA accommodated her disability when it provided her with a parking pass within a reasonable period of time and also offered the "alternative reasonable accommodation" of a part-time work schedule, which she declined.  J.A. 1007–08; *see Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019) (delay in providing an accommodation may be reasonable where accommodation request is under active consideration); *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015) (employer may, at its discretion, provide an alternative reasonable accommodation to the exact accommodation requested).

The court then rejected Smith's argument that she was entitled to work remotely, finding that DEA had the right to determine her place of performance, that her medical documentation did not state that remote work was necessary for her to perform the essential functions of her job, and that DEA was not required to provide her preferred accommodation.  J.A. 1008.  Because DEA accommodated Smith, the district court held that the agency was entitled to judgment as a matter of law on this claim.  J.A. 1008.

---

[4] The district court's reference to an ADA claim against DEA is perplexing because the operative complaint does not assert such a claim against DEA.  It alleges that DEA violated Smith's right to a reasonable accommodation and terminated her in retaliation for complaining about DEA's discriminatory actions in violation of the Rehabilitation Act. *See* J.A. 27-28.  To the extent that the district court references Smith's claims against DEA as violations of the ADA, we construe them as Rehabilitation Act claims.  Although the ADA and the Rehabilitation Act employ different statutory language, our Court has construed them to "impose similar requirements." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).  Both statutes "require a plaintiff to demonstrate the same elements to establish liability." *Id.*

Next, the district court found that to the extent that Smith's claims also asserted that she was terminated because she is disabled, those claims failed because DEA articulated legitimate, nondiscriminatory reasons for terminating Smith's services, including her alleged violation of DEA's information security policy, poor work performance, and refusal to follow instructions and to report to work at DEA headquarters, all of which demonstrated her failure to satisfy DEA's legitimate employment expectations. The court concluded Smith's inability to demonstrate that these reasons were pretextual was fatal to her discrimination claim.

Finally, the district court awarded summary judgment to DEA on Smith's claim she was terminated in retaliation for requesting an accommodation and for filing an EEO complaint. The district court concluded that "the record lack[ed] direct evidence of retaliation," and thus Smith did not meet her burden to establish a causal link between her protected activity and DEA's adverse employment action. J.A. 1013–14. The court found "any inference of retaliation is undercut because [Smith] received an accommodation from DEA, and was offered another which she declined," and that "the record is devoid of evidence that Quinn, the decision-maker in her case, was aware that she filed EEO complaint." *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (employer's knowledge that plaintiff engaged in protected activity is "absolutely necessary" to establish prima facie case of retaliation). J.A. 1014. Further, as with Smith's disability discrimination claim, the court found there was no evidence that DEA's articulated reasons for the adverse employment action were pretextual. In the court's view, "[t]he undisputed facts show[ed] that Smith's performance was deficient, she

20

was resisting instructions and defying work requirements." J.A. 1014-15. Because she "[had] not pointed toward any evidence showing [her] termination[] [was] pretextual," the court held her "retaliation claim[] therefore fail[ed] as a matter of law." J.A. 1015.

This timely appeal followed.

II.

On appeal, although she asserted claims against CSRA for violation of the ADA and the Rehabilitation Act, and against DEA for violation of the Rehabilitation Act, Smith contends that CSRA, in violation of the ADA, and DEA, in violation of both the ADA and the Rehabilitation Act, discriminated against her by refusing to provide reasonable accommodations for her disability, and by terminating her in retaliation for engaging in protected activity. She maintains that as a joint employee of both CSRA and DEA, she was entitled to protection from DEA's disability discrimination in violation of the Rehabilitation Act, as well as the discriminatory actions of both joint employers in violation of the ADA.

Both CSRA and DEA challenge Smith's claims. CSRA maintains that Smith performed her duties as an independent contractor, not as an employee, and because CSRA was not her joint employer, she is not entitled to ADA protections from CSRA.[5] And DEA argues that it was not error for the district court to find, without deciding whether DEA

---

[5] Smith has not appealed the district court's findings that Section 503 of the Rehabilitation Act does not provide a private right of action, and that CSRA, a government contractor, is not subject to Section 504 of the Act. *See Painter*, 710 F.2d at 143; *DeVargas*, 911 F.2d at 1383. Thus, Smith's only claim against CSRA on appeal is that CSRA discriminated against her based on her disabilities in violation of the ADA.

21

was Smith's joint employer, that Smith's claims failed as a matter of law because Smith could not show that DEA failed to provide her with a reasonable accommodation, or that DEA terminated her services in retaliation for engaging in protected activity rather than for legitimate, nondiscriminatory reasons related to her work performance. We first address Smith's ADA claim against CSRA.

A.

1.

The parties dispute the proper classification of Smith's working relationship with CSRA. In Smith's view, CSRA's ADA liability arises from CSRA's and DEA's status as her joint employers subject to the requirements of the ADA. She argues that the district court erred in concluding that she was an independent contractor not entitled to ADA relief from CSRA. She contends that analysis of the "economic realities" of the relationship proves first her status as a DEA employee, and further, that CSRA shared control of her DEA employment to such an extent as to render CSRA her joint employer. Thus, Smith concludes CSRA should be held liable for her claims arising under the ADA. We disagree. An analysis of the facts and the law leads us to conclude Smith was an independent contractor.

2.

The ADA provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "To establish a claim of disability discrimination under the ADA, a plaintiff

22

must prove '(1) that she has a disability, (2) that she is a "qualified individual" for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'" *Jacobs*, 780 F.3d at 572 (quoting *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)).

The ADA assumes the existence of an employer/employee relationship. It defines an "employee" as "an individual employed by an employer," 42 U.S.C. § 12111(4), and a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the *employment position* that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). The ADA "does not protect independent contractors from discrimination based upon disability." *Chamberlain*, 180 F. Supp. 3d at 391 (citing *Ratledge*, 2011 WL 652274, at *2); *see also Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 427 & n.20 (5th Cir. 2016) (collecting persuasive authority that independent contractors are not covered by Title I of the ADA). Accordingly, because the ADA applies to employers and affords protections to employees engaged in an employment relationship, Smith must establish that she was an employee engaged in an employment relationship with the defendant employer to recover under the ADA.

3.

"For purposes of the ADA, an employment relationship is determined under agency principles and the 'economic realities' of the relationship." *Chamberlain*, 180 F. Supp. 3d at 391 (citing *Garrett*, 721 F.2d at 981 (whether an individual is an employee is determined by analyzing the facts of each employment relationship under a standard incorporating both the common law test derived from principles of agency and the so-called 'economic

23

realities' test)). Whether an independent contractor relationship exists is a question of law. *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261 (4th Cir. 1997).

Whether an individual is an employee or an independent contractor "is properly determined by analyzing the facts of each employment relationship" by considering the following factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer;" (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Garrett*, 721 F.2d at 982 (citation omitted). Control is the most important factor to be considered, but it is not dispositive. *Id.*, *see also Butler*, 793 F.3d at 409 (no one factor is determinative, but "the Fourth Circuit has consistently focused on control").

Applying these principles to the facts before us, we cannot conclude that the district court erred in finding that Smith was an independent contractor and not a CSRA employee. An examination of the facts underlying each *Garrett* factor supports such a conclusion. As the district court noted, prime contractor CSRA is engaged in the business of staffing government contracts. In accordance with the requirements of DEA's task order, CSRA contracted with Smith's company, Smith Global, in 2016 for Smith to work for DEA as a geospatial intelligence subject matter expert, which requires highly specialized technical

24

expertise. CSRA did not supervise Smith's work product, determine her work hours or location, or even provide the equipment necessary to perform the work. DEA determined the tasks to be completed, and her work product was deliverable directly to the agency. These facts weigh heavily against a finding that Smith was a CSRA employee.

Further, the terms of the Consultant Agreement demonstrate that it was the expressed intention of the parties to establish an independent contractor relationship. The Agreement explicitly refers to Smith as an independent contractor who was terminable at will without notice. Pursuant to the Agreement, CRSA performed the administrative function of issuing Smith's paychecks, but did not withhold federal taxes from her compensation or provide her with benefits offered to CSRA employees. These facts further support a finding that Smith contracted with CSRA to perform services as an independent contractor rather than an employee.

Finally, the facts support the district court's conclusion that CSRA lacked the necessary control over Smith. CSRA exercised no management control over any aspect of the geospatial intelligence work Smith was contracted to perform. As the district court noted, "CSRA's role was simply to provide an expert in the relevant field to DEA, and CSRA did that by finding [Smith] and instructing [her] to report to DEA pursuant to DEA's requirements." J.A. 1004. The facts demonstrate that DEA officials were driving CRSA's contractual decisions regarding Smith as well. Barnhart initially assured Tyler that CSRA would terminate its agreement with Smith on June 2, but later declined to do so based on a belief that the issuance of the parking pass would enable Smith to satisfy DEA's requirement that she report to work at DEA headquarters each day. CSRA ultimately

25

exercised its authority to terminate the Consultant Agreement but did so only when DEA's revocation of Smith's security clearance made it impossible for her to meet her contractual obligations. Accordingly, we agree with the district court that the *Garrett* factors support the conclusion that, as a matter of law, Smith was an independent contractor, and thus is not a qualified individual entitled to ADA protections from CSRA.

## B.

Based on these same facts, we are compelled to conclude that CSRA was not Smith's joint employer. In determining whether two entities are joint employers, this Court considers the following factors:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

*Butler*, 793 F.3d at 414. The Court considers the first three *Butler* factors the most important in determining whether a joint employment relationship exists. *Id*. As with the

26

*Garrett* independent contractor factors, control is the "principal guidepost" of this analysis. *Id*. An analysis of the *Butler* factors weighs against a finding that Smith was CSRA's employee. CSRA lacked the degree of control over the essential terms and conditions of Smith's work necessary to conclude that she and CSRA were engaged in an employment relationship.

## III.

Next we turn to Smith's claims against DEA—that the agency failed to accommodate her disability and retaliated against her for requesting accommodations and filing an EEO complaint. We find first that the district court properly granted summary judgment on Smith's failure to accommodate claim.

## A.

To establish a prima facie case of failure to accommodate, a plaintiff must show: "(1) "that she was an individual with a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; (4) that the employer refused to make such accommodations." *Jacobs*, 780 F.3d at 579. The parties disagree as to the fourth element. DEA contends that it did not refuse to accommodate Smith's disability and we agree.

Smith bears the burden to identify an accommodation, and ultimately, she must persuade a trier of fact that the accommodation is reasonable. *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002). After DEA required Smith to report to DEA headquarters in

person each day, Smith requested both a parking pass and that the agency continue to authorize remote work as an accommodation for her disability. But an employer is not required to provide "the exact accommodation that the employee requested," and in the alternative may provide "an alternate reasonable accommodation" at its discretion. *Reyazuddin*, 789 F.3d at 415.

In some circumstances, an "unreasonable delay" may constitute a denial of an accommodation. *See Marks v. Wash. Wholesale Liquor Co.*, 253 F. Supp.3d 312, 324 (D.D.C. 2017). But "[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim." *Id*. Further, a delay may be found reasonable where the record demonstrates the accommodation request is under active consideration. *See Hannah P. v. Coats*, 916 F.3d 327, 338 (4th Cir. 2019).

DEA contends that it offered Smith a reasonable accommodation—the parking pass—within a reasonable period of time, and it was not required to offer her the accommodation of remote work she requested even though it had been provided in the past. Although the record demonstrates that DEA did not take the smoothest route to issuing Smith a parking pass, it did in fact issue it five weeks after her request. We agree with the district court that five weeks was not an unreasonable delay given that her request was under consideration. During this period, DEA requested, and Smith provided, updated medical documentation, and DEA inquired into what accommodations could be offered to Smith in her capacity as a contractor under the law, DEA's Accommodations Policy, and the building lease, which generally did not permit contractors access to DEA's parking facilities. *See Hannah P.*, 916 F.3d at 337.

28

Finally, we conclude that DEA was not required to offer Smith a remote work accommodation and its failure to do so was not a refusal to accommodate. Consistent with the updated medical documentation Smith provided, she received the reasonable accommodation she requested (and that her physician specifically stated was needed) to perform the essential functions of her job and meet her employer's legitimate expectation that she report to DEA headquarters for work daily. Although the documentation noted that Smith had received remote work authorization as an accommodation in the past, it did not specifically state that such an accommodation was required.[6] Moreover, the relevant contract terms permitted DEA to determine the place where Smith would perform her work for DEA.

There is no genuine dispute of fact that DEA did not refuse to provide Smith a reasonable accommodation for her disability. DEA provided her the reasonable accommodation that she requested and that was supported by the medical documentation she provided. Accordingly, DEA is entitled to summary judgment on this claim.

B.

Next we turn to Smith's claim that DEA retaliated against her for engaging in protected activity, namely requesting accommodations for her disability and filing an EEO complaint. We find that Smith has established a prima facie case of retaliation. She has

---

[6] Because we conclude that DEA offered Smith a reasonable accommodation in the form of a parking pass, we need not consider whether the part-time work schedule DEA offered constituted an "alternate reasonable accommodation." *See Reyazuddin*, 789 F.3d at 415; 42 U.S.C. § 12111(9)(B) ("reasonable accommodation" may include "part-time or modified work schedules").

presented sufficient evidence to demonstrate a causal relationship between her protected activity and DEA's adverse action. An examination of the record reveals that, contrary to the district court's findings, the evidence supports an inference that DEA took adverse action against Smith for requesting a parking pass and seeking permission to work remotely. The evidence also supports a finding that Quinn had knowledge of Smith's EEO complaint when she revoked her DEA security clearance. Additionally, a causal link is further established by the temporal proximity between Smith's complaint and the adverse action taken against her. Finally, we find that there are genuine issues of material fact concerning whether the reasons proffered for Smith's termination were pretext for retaliation.

## 1.

"[T]o prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." *Jacobs*, 780 F.3d at 577 (quoting *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001)).

In the absence of direct evidence of retaliation, Smith has pursued her retaliation claim via the application of the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (retaliation claim may be proven through direct evidence of retaliation or via the application of the *McDonnell Douglas* burden-shifting framework); *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 782–83 (4th Cir. 2021) (citing *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (same)). Under the *McDonnell Douglas* framework, a plaintiff must first show: (1) she engaged in

30

a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action. *Rhoads*, 257 F.3d at 392. After a prima facie case is made, the burden shifts to the employer "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Id.* (quoting *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). If the employer makes this showing, the plaintiff must demonstrate that the proffered reason is pretext for retaliation. *Rhoads*, 257 F.3d at 392. The ultimate burden to prove retaliation rests with the plaintiff. *Id*.

2.

Here, there is no dispute that Smith satisfied the first and second prongs of a prima facie case of retaliation. She suffered an adverse employment action when Quinn revoked her security clearance after she made repeated requests for accommodation and just days after she filed an EEO complaint. But the district court found that Smith failed to satisfy the third prong of a prima facie case of retaliation, which requires her to show that there was a causal relationship between the protected activity and the adverse employment action. *See Rhoads*, 257 F.3d at 392. In reaching this conclusion, the district court made two specific findings. First, any inference of retaliation based on Smith's request for an accommodation was "undercut because she received an accommodation from DEA, and was offered another which she declined." J.A. 1014. Second, there was no evidence of causation because "the record is devoid of evidence that Quinn, the decision-maker in her case, was aware that [Smith] filed the EEO complaint," and "[t]he undisputed facts show Quinn was not aware of Smith's EEO complaint." *Id.*

31

Each of these findings is flawed. The district court failed to consider facts demonstrating the causal connection between Smith's protected activity and the adverse action taken against her. The first finding ignores the reality of how Smith came to receive one accommodation and the manner in which she was offered the other. The second finding is directly contrary to facts demonstrating that a question of fact remains as to whether Quinn knew of Smith's EEO complaint.

3.

a.

"[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018). Indeed, "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Roberts*, 998 F.3d at 127 (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012)). "A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes." *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 F. App'x at 783–84). "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citing *Johnson*, 839 F. App'x at 783-84; *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that relevant evidence may be used to establish causation)). "A plaintiff may also show that 'the adverse act bears sufficient temporal proximity to the protected activity.'" *Roberts*, 998 F.3d at 123 (citing *Johnson*, 839 F. App'x at 783–84; *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). "The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal

connection between the protected activity and the adverse action." *Id*. Here, we find that the facts, in the light most favorable to Smith, are sufficient to establish the requisite causal connection via both of these evidentiary routes.

b.

We first address the district court's finding that the evidence does not support the inference that Quinn retaliated against Smith for requesting accommodations because Smith received a parking pass from DEA and declined DEA's offer of a part–time work schedule. We find that both the relevant facts and the temporal proximity of events undermine the district court's conclusion.

While it is certainly true that Smith ultimately received a parking pass, she received it approximately five weeks after her initial request, during which her requests for both the pass and for remote work authorization were repeatedly denied, and only *after* Smith filed an EEO complaint alleging the failure of DEA officials to accommodate her medically documented disability. Smith had reiterated to Tyler as recently as May 23 that she needed a parking pass to report to work daily. On May 26, just three days prior to the filing of her EEO complaint on May 29, Tyler and Barnhart had made it clear that Smith was required to report to work at DEA headquarters each day without a parking pass and that she would have to "make a decision" about whether she would continue working for DEA. And on June 1, Tyler and Barnhart discussed releasing Smith on June 2, based at least in part on

33

the ground that Smith continued to work remotely without authorization.[7]  Certainly, it is reasonable to infer that but for the intervention of DEA's EEO office, Smith would have received no accommodation at all, and DEA's intention to bring its working relationship with Smith to an end was thwarted by the issuance of the parking pass.

Further, Smith's rejection of the proposed part-time work schedule can be attributed, at least in part, to confusion regarding the details of the proposed accommodation.  The part-time work accommodation, as summarized in Barnhart's email, permitted Smith to work only three days per week, resulting in a reduction in Smith's work hours.  Smith specifically objected to this reduction in her response.  Although the DEA later proposed an accommodation that would have permitted Smith to work up to five days a week at her discretion, this proposal was never communicated to Smith.

Despite these facts, DEA urges this Court to affirm the district court's findings.  In support of its argument, DEA relies on several cases that are non-binding and factually inapposite.  DEA cites this Court's unpublished opinion in *Hollestelle v. Metropolitan Washington Airports Authority*, No. 97-1465, 1998 WL 228199, at *1 (4th Cir. May 8, 1998), where this Court held that the defendant employer's "considerable efforts to accommodate [the plaintiff] even after it knew [he] had filed a discrimination complaint completely undercut[]" his retaliation claim.  *Id*. at *4.  DEA contends that it "strains credulity that a defendant would make such efforts while acting with retaliatory animus

---

[7] Just two days after Smith filed her complaint, Tyler directed Barnhart to retrieve Smith's remote token, ostensibly because she continued to work remotely without authorization.  But Smith has not alleged that Tyler knew of her complaint when she issued this directive.

34

arising out of that protected activity." Appellee's Br. 37–38. But an examination of the underlying facts reveals a set of circumstances very different from the ones presented here.

In *Hollestelle*, the plaintiff's employer adjusted his work hours to address his chronic tardiness. Over the next year and a half, Hollestelle continued to arrive late and received a warning, a reprimand, and a suspension before he notified his employer he was being treated for depression, which he asserted affected his ability to report to work on time. Hollestelle's employer held his suspension in abeyance pending the receipt of medical documentation, but ultimately imposed the suspension when the documentation failed to address any connection between his depression and his tardiness. *Id*. at *1. Hollestelle's employer later agreed to allow him a ten-minute arrival window for reporting to work, but Hollestelle still filed a complaint alleging his employer had discriminated against him by disciplining him for his tardiness and failing to accommodate him. The employer again modified Hollestelle's work schedule, increasing his arrival time window to fifteen minutes, but in just over two months he was tardy another 42 times—on average by 27 minutes. *Id*. at *2. Finally, the employer changed his start time from 8:15 a.m. to 9:30 a.m., but he was still tardy 55 times over the next 66 days. Only then did his employer fire him. *Id.*

Hollestelle's employer made several accommodations for his tardiness—adjusting the time he was required to report on numerous occasions—both before and after receiving notice of a disability—*and* before and after he filed a complaint. By contrast, DEA offered Smith no accommodations at all. In fact, DEA flatly refused to do so and informed her she needed to "arrive and report to work at HQ everyday or resign"—until *after* she filed a

35

complaint. J.A. 479. Certainly, one could infer that DEA did not "willingly" offer Smith the parking pass nor were its actions analogous to the "considerable effort to accommodate" that this Court determined would undercut any inference of retaliation.[8] In fact, DEA's actions lead one to infer the opposite.

DEA also contends that any inference of retaliation is further undermined by the fact that Quinn developed concerns regarding Smith's work performance before Smith engaged in any protected activity. This fact does not alter our conclusion here. The relevant facts demonstrate that DEA was frustrated that Smith had not followed the directive to report to work at DEA headquarters daily. Smith received an ultimatum to report to work as instructed each day or resign despite her repeated insistence—supported by medical documentation—that she could not do so without a parking pass. She then filed her EEO complaint and was able to secure in a matter of days what DEA officials had not been able (or willing) to provide over several weeks. By this date Barnhart and Tyler were already discussing plans to terminate her if she did not resign. When the effort to force her

---

[8] The same is true for other cases DEA cites where employers made significant accommodations prior to its adverse action. *See Kerney v. Mountain States Health Alliance*, 894 F. Supp. 2d 776, 781 (W.D. Va. 2012) (no inference of retaliation for requesting accommodation where was plaintiff granted significant period of medical leave but did not communicate to employer that she required an accommodation upon returning to work); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 17 (1st Cir. 1997) ("[e]vidence that an employer *willingly* granted an employee request for an accommodation, though by no means dispositive of the matter, tends to militate against making an inference of retaliation") (emphasis added); *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 40 (1st Cir. 2011) (no showing of retaliatory intent where employer made repeated efforts to accommodate employee over the course of nearly two decades); *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010) (employer's numerous accommodations of employee inconsistent with finding of retaliation).

resignation failed when Smith unexpectedly received the parking pass, Quinn revoked her security clearance without any explanation. This action in turn caused CSRA to terminate its agreement with Smith. These facts, contrary to the district court's conclusion, support an inference of retaliatory animus on the part of DEA against Smith for filing the EEO complaint that blocked their effort to force her out of her position. DEA's adverse action, taken within days of Quinn learning of the complaint, also "bears sufficient temporal proximity to [Smith's] protected activity" to suggest that the adverse action was taken because of the protected activity. *See Johnson*, 839 F. App'x 783–84; *Clark Cnty.*, 532 U.S. at 273–74.

In sum, a full examination of the circumstances surrounding Smith's receipt of the parking pass and rejection of a part-time work schedule permits the inference that DEA's adverse actions were taken in retaliation for Smith requesting an accommodation her DEA supervisors did not wish, but were ultimately required, to provide. Collectively, these circumstances create a question of fact as to whether there was a causal connection between Smith's accommodation requests and EEO complaint and the adverse action taken against her.

c.

The district court's second finding—that there was no evidence that Quinn knew of Smith's EEO complaint—was simply error. A review of the record and the timeline of events reveals there are genuine issues of material fact that preclude summary judgment on this issue as well.

i.

37

"To establish a causal relationship between the protected activity and the [adverse action], a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts*, 998 F.3d at 124; *see also Johnson*, 839 F. App'x at 783–84 (citing *Dowe*, 145 F.3d at 657 (plaintiff cannot establish the causation element of a prima facie case where the relevant decisionmaker is unaware of the protected activity)). "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Roberts*, 998 F.3d at 124 (citing *Dowe*, 145 F.3d at 657) (citations omitted)). Accordingly, our analysis must consider what Quinn, the decisionmaker, knew at the time of the adverse employment action.

ii.

The district court found that "the record is devoid of evidence that Quinn, the decision-maker in her case, was aware that [Smith] filed the EEO complaint," and that "[t]he undisputed facts show Quinn was not aware of Smith's EEO complaint." J.A. 1013–14. Based on this erroneous finding, the district court held that Smith did not meet her burden to establish a causal link between her protected activity and DEA's adverse employment action.

But DEA admits that the record provides at least some proof that Quinn was aware that Smith filed a complaint regarding the agency's failure to accommodate her disability. DEA acknowledges that on June 6, Quinn received a copy of the email informing Tyler of Smith's EEO complaint and inviting Tyler to an interview as part of the investigation. But additional emails also indicate that Quinn was aware of Smith's complaint as early as June

38

2. On that date, Quinn received emails from McDaniel regarding an EEO matter involving Smith. She then spoke with an EEO counselor and scheduled a teleconference with McDaniel for the following Monday.

DEA downplays the significance of this evidence, arguing "mere knowledge . . . is not sufficient evidence of retaliation . . . ." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). This argument, however, fails to address the temporal proximity of these events to Quinn's adverse action. The evidence tends to prove not only that Quinn was aware of the complaint, but that she was aware of it when she revoked Smith's security clearance just days after Smith filed her complaint and received a parking pass.

Smith has established not only "the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity,'" *Roberts*, 998 F.3d at 123 (citing *Johnson*, 839 F. App'x at 783-84; *Lettieri*, 478 F.3d at 650), but also that "'the adverse act bears sufficient temporal proximity to the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 F. App'x at 783–84; *Clark Cnty.*, 532 U.S. at 273–74). We find these facts, considered in the light most favorable to Smith, are sufficient to establish the requisite causal connection via both of these evidentiary routes. *See Roberts*, 998 F.3d at 123 (citing *Johnson*, 839 F. App'x at 784 (relevant facts alone, or together with temporal proximity, may establish a causal connection between the protected activity and the adverse action)). Here, the documentary evidence, together with the timeline of events, is sufficient to establish that Quinn was aware of Smith's EEO complaint when she made the decision to revoke her security clearance, and supports a finding that the causation prong of a prima facie case of retaliation has been satisfied. We find that the district court's findings to the

39

contrary were in error, and that genuine issues of material fact preclude summary judgment on Smith's retaliation claim.

d.

The district court found that even if Smith had established a prima facie case of discrimination, Smith could not meet her burden to show that the legitimate, nondiscriminatory reasons DEA proffered as grounds for her separation were pretext for retaliation. We again conclude that the district court's findings are in error.

If a plaintiff can demonstrate "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation]," summary judgment is not appropriate. *Burgess*, 466 F. App'x at 277 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). Further, the Supreme Court has held that "a plaintiff's prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false, support[s] an inference of discrimination sufficient to defeat summary judgment." *Burgess*, 466 F. App'x at 277 (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)). We believe that Smith has made such a showing here.

The district court found that "undisputed facts" showed that Smith's performance was "deficient," and that she "was resisting instructions and defying work requirements." J.A. 1014-15. Smith's retaliation claim failed as a matter of law, the court concluded, because she had not "pointed toward any evidence showing [her] termination[] [on these grounds] to be pretextual." J.A. 1015. Indeed, DEA has proffered legitimate nonretaliatory reasons for Smith's termination, largely centered on perceived deficiencies in her work

40

performance—the most serious among them her failure to report to DEA headquarters daily despite the difficulties she faced in doing so without a parking pass, and her alleged violation of DEA's information security policy. But viewing the evidence in the light most favorable to Smith, there is a genuine issue of material fact regarding the proffered reasons for her termination.

First, we note that a factfinder may infer that an employer's post-hoc rationale is not a legitimate explanation for an adverse employment decision. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001). Moreover, an employer's provision of shifting and inconsistent justifications for taking an adverse employment action "is, in and of itself, probative of pretext." *Id.* at 852–53; *see also Jacobs*, 780 F.3d at 575 (lack of contemporaneous documentation and inconsistent justifications for an adverse action could lead reasonable jury to conclude justifications are pretext).

Here, DEA has not presented any contemporaneous documentation in support of its reasons for terminating Smith. And the proffered reasons for her termination have evolved over time. Of particular concern is Quinn's allegation that a violation of DEA's information security policy caused her to revoke Smith's security clearance. When first asked to provide the reason for revoking Smith's security clearance, Quinn gave no reason at all. She did not document the details of the incident or conduct even the most basic factfinding. There is no evidence in the record that Quinn confronted Smith with her concern, asked her to explain, or even acted further to determine what DEA information might have been compromised. Quinn certainly did not discuss the matter with Barnhart, as he asserted that he knew of no reason why Quinn would take such an action.

41

A week after Smith's separation, Tyler prepared a memorandum to document DEA's issues regarding Smith's work performance, but an alleged violation of DEA's security policy was not among the concerns noted. Finally, the timing of Quinn's actions in relation to other events is suspect. The record establishes, contrary to the district court's conclusion, that Quinn was aware of Smith's EEO complaint at the time of the revocation, which both factually and temporally undermines DEA's claim that Quinn's action was not retaliatory. We find that a reasonable jury could infer that Quinn's post-hoc allegation that Smith made statements indicating that she stored DEA information on her personal computer was pretextual.

Similarly, a reasonable jury could find that the other proffered performance issues were not the true reason Quinn revoked her security clearance. The most serious of these reasons related to Smith's in-person attendance. Tyler's memorandum describes how Smith had worked only a certain number of "validated" hours, as her remote work hours were not authorized. During much of this period, however, Smith had requested, but had been refused, either a parking pass or remote work authorization. In any event, there would have been no reason to revoke Smith's security clearance on this ground once she received the parking pass that enabled her to perform her duties in person.

As for Smith's other alleged performance issues, the testimony of DEA employees is inconsistent with DEA's allegations. Tseng, Smith's project manager, testified that he was surprised to learn Smith had been terminated. Contrary to what DEA alleges, Tseng testified in her last week at DEA Smith had "made progress" in providing the information he requested. Further, he stated that the only issue Tyler seemed to have with Smith was

42

that she "didn't come in the office." He was told later that Smith's termination was a "management decision." J.A. 1637–39. And although Quinn gave Barnhart no reason for revoking Smith's security clearance, he believed that it was because she did not report to work daily to DEA headquarters. As for Tyler, email correspondence reveals that with Tyler's blessing and oversight, Barnhart had already intended to dismiss Smith—after Quinn learned of Smith's EEO complaint and before Quinn revoked her clearance. These facts undermine the credibility of DEA's allegations and call into question the proffered reasons for her termination.

## V.

For the foregoing reasons, we affirm the judgment of the district court as to Smith's disability discrimination claim but vacate the court's decision regarding her retaliation claim and remand the issue to the district court for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*